646 July 13, 2017 No. 37

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Appellant,*

*v.*

TREVIN MICHAEL KING,
*Respondent.*

(CC 15CR22123; SC S063810)

On direct appeal of the order of dismissal of the Linn County Circuit Court, under ORS 138.060(2)(b).

David E. Delsman, Judge.

Argued and submitted June 15, 2016.

Jennifer S. Lloyd, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Mary M. Reese, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for respondent. Also on the brief was Ernest G. Lannet, Chief Defender.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Nakamoto, and Flynn, Justices, and Brewer, Senior Justice pro tempore.*

NAKAMOTO, J.

The judgment of the circuit court is affirmed.

_____
* Baldwin, J., retired March 31, 2017, and did not participate in the decision of this case. Duncan, J., did not participate in the consideration or decision of this case.

**NAKAMOTO, J.**

Defendant pleaded guilty to second-degree assault and no contest to first-degree robbery in accordance with an oral plea agreement reached with the state. Six months later, the victim died because of his injuries from the assault, and then the state began another prosecution against defendant: for felony murder and manslaughter. As a consequence of the plea agreement, the trial court granted defendant's pretrial motion to dismiss the indictment and dismissed the case. The state appeals the dismissal order. *See* ORS 138.060(2)(b) (state may appeal order dismissing accusatory instrument; if murder is charged, appeal is to this court).

As this court observed in *State v. Heisser*, 350 Or 12, 23, 249 P3d 113 (2011), principles of contract law generally inform the determination of whether a plea agreement has been performed. However, contract principles that apply in a commercial setting do not necessarily suffice for an analysis of a plea agreement, because the rights of criminal defendants "not ordinarily found in contracts between private parties *** may override contractual principles." *Id*. This case presents an issue of first impression in Oregon that lies at the confluence of the contractual incompleteness of a plea agreement and the waiver of constitutional rights by criminal defendants: whether the state may reprosecute defendant for homicide when the state knew at the time of defendant's plea agreement that the victim could die; when the potential for future prosecution was not a subject of plea negotiations or of the plea agreement; and when defendant relinquished trial-related constitutional rights and entered pleas on non-homicide charges with the belief that the plea agreement ended all prosecutions arising out of the criminal incident.

In seeking reinstatement of the indictment, the state contends that, applying ordinary principles of contract interpretation, the plea agreement poses no bar to the state's otherwise permissible prosecution of defendant for homicide and that defendant assumed the risk of the victim's death. Defendant rejoins that the contract principles the state advances cannot be woodenly applied when a criminal defendant relinquishes state and federal constitutional

rights as part of a negotiated plea. He asserts, among other arguments, that, to address the contingency of the victim's death, the trial court correctly recognized and applied a default contractual term to the plea agreement to bar his reprosecution for homicide.

As did the trial court, we conclude that a contractual default rule fills the gap in the plea agreement and prevents defendant's reprosecution. Accordingly, we affirm.

## I.   BACKGROUND

Although the parties disagree regarding the contract and criminal law principles that should govern the analysis, they agree that this court reviews the trial court's ruling for legal error. We agree and add that we will not disturb the trial court's factual findings if they are supported by the record. *E.g.*, *Heisser*, 350 Or at 25-28 (examining under standard). We state the facts in accordance with that standard of review.

A.   *The Assault*

One night in early August 2013, defendant and his codefendant, Jimenez, were at a hospital in Lebanon, Oregon. Defendant was 17 years old. He and Jimenez, an adult, were intoxicated and disruptive. A security guard who followed them out of the hospital heard defendant tell Jimenez that his bicycle had been stolen and that he wanted to beat someone up. Several hours later, the security guard saw defendant and Jimenez walking a bicycle near the hospital.

The next day, the victim was found lying in a parking lot near the hospital. The victim's bicycle was gone, but defendant's insurance card was found nearby. The police then discovered that defendant was a runaway minor and that he and Jimenez had been at the hospital. The police saw the victim's bicycle at Jimenez's residence, and Jimenez and defendant were arrested. Both of them made incriminating statements during interviews by the police.

The victim had multiple head injuries and was in a coma in the hospital. In the days after the victim was found, hospital personnel informed police that he was stable but that there was a possibility that he could die from his

injuries. At the end of August, the victim was transported to a specialty hospital in Portland for long-term acute care. Although the victim regained consciousness several months after his move, his brain injuries were so significant that the right side of his body was paralyzed; he was incontinent; and he no longer could eat or drink, walk, or communicate with people normally. He remained bedridden at the long-term care facility until his death.

B.  *Defendant's Plea Agreement and Codefendant's Trial*

In August 2013, the state charged defendant and Jimenez with second-degree assault, ORS 163.175(1)(a) ("intentionally or knowingly caus[ing] serious physical injury" to the victim), and first-degree robbery, ORS 164.415(1)(c) (robbery enhanced by infliction of serious physical injury to the victim). In the fall of 2013 and early 2014, the parties engaged in negotiations for a plea agreement. The parties first attended a settlement conference with a circuit court judge in October 2013. The issue of what would happen if the victim died was not discussed. The prosecutor provided a formal written plea offer to defendant and Jimenez, dated the next day, which also was silent regarding that contingency. In early January 2014, the parties had a second settlement conference, but that did not result in an agreement. Later in January, after the trial court denied defendant's motion *in limine* seeking merger of the assault and robbery counts, defendant and the state arrived at a plea agreement. The parties never discussed the possible death of the victim and the potential for homicide charges if the victim were to die.

The parties did not enter into a written agreement, although defendant and his attorney signed a petition dated January 28, 2014, to enter pleas to the charges. The prosecutor did not see the petition before defense counsel provided it to the court at a "final resolution" pretrial conference held that day. Among other things, the plea petition contained the following items: First, it described the two counts of the indictment, the maximum penalty for each crime, and the plea that defendant would enter on each count. Second, it recited various potential collateral consequences of convictions, such as the inability to own or possess firearms if

defendant was convicted of a felony crime; "the imposition of certain costs and fees in addition to any fines imposed"; the possible violation or revocation of probation, parole, or post-prison supervision he may have been serving; and the possibility of consecutive sentences. Third, it warned that defendant was giving up most of his rights to appeal, although it stated that defendant was making a conditional plea that reserved the right to appeal the denial of his motion *in limine* regarding merger of the counts. Fourth, the petition contained defendant's representation that he understood that he was "giving up" five enumerated rights related to a trial (his "right to a speedy trial by jury," his right to be represented at trial by an attorney, his "right to confront and cross-examine witnesses called to testify" against him, his "right to compel witnesses to come to court," and his "right to remain silent") and his "legal status of being innocent until proven guilty beyond a reasonable doubt." And fifth, it recited that "[n]o threats" had been made to defendant to induce entry of the plea and "no promises" had been made "except as may have been stated in open court."

The petition did not touch on the condition of the victim or what could happen if the victim were to die. Nor were those topics raised at the pretrial conference when defendant presented the petition to the court.

Defendant's plea and sentencing hearing took place in late February 2014. The terms of the oral plea agreement between defendant and the state were stated on the record. In exchange for his pleas, the state and defendant jointly recommended to the court that defendant be sentenced to serve 120 months in prison: 70 months for the assault count and 90 months for the robbery count, with 50 of those 90 months to be served consecutively to (and 40 months to be served concurrently with) the prison term for the assault. The state also agreed that defendant could appeal the court's ruling that the convictions should not merge. Defendant pleaded guilty to assault in the second degree and no contest to robbery in the first degree. Neither the court nor counsel raised the issue of what would happen if the victim died.

Before the court sentenced defendant for the assault and robbery, the victim's brother described the victim's

severely diminished physical and mental condition and said
that family members questioned whether they had made the
right decision in directing doctors at the hospital "to fight
for [the victim's] life." The prosecutor also described the vic-
tim's condition at the hearing:

> "He was in a coma for quite some time at the hospital[.]
> [H]e was ultimately sent to rehab. He's still in a rehab cen-
> ter. While he's probably not in a coma he certainly is * * *
> never going to be functioning in the manner that he ever
> was before. Who knows at this point. I mean it's just a really
> long term process as to where he's going to be headed."

The court sentenced defendant to serve a total of
120 months in prison, accepting the parties' recommenda-
tion for a partially concurrent sentence because of the nego-
tiated agreement and defendant's youth. The court also
imposed two 36-month periods of post-prison supervision
and assessed felony fines.

Unlike defendant, Jimenez rejected the state's plea
offer. He proceeded to trial with the same prosecutor several
months later, in May 2014.

At the trial, the state presented evidence concern-
ing the victim's condition. The neurologist who had evalu-
ated the victim at the hospital testified about the victim's
initial prognosis: the victim could have had a "substantial
risk of death." The victim's attending physician at the long-
term care facility also testified about the victim's prognosis.
She recounted that she had told the victim's family members
that, because of his conditions, such as being unable to swal-
low and move appropriately, the victim was "highly likely" to
develop other significant medical conditions and that, when
that happened, they should transition him to hospice care
and not attempt treatment given his overall poor prognosis.

Defendant also testified at the Jimenez trial, on
behalf of the defense. Although the record in this case does
not include a transcript of defendant's trial testimony, it
does include the state's closing argument. The prosecutor
urged the jury to reject defendant's account that he had lied
during his police interview and his self-incriminating testi-
mony at trial that, as the prosecutor put it, "it was all me,

[Jimenez] didn't do anything." She explained that defendant had already accepted a plea deal and could testify without consequences: Defendant "has already done his thing, he's not going to get into any more trouble, he knows that. So why not protect [Jimenez]." The jury convicted Jimenez, and he was sentenced to 160 months in prison for the assault and the robbery.

## C.  *Homicide Charges and Defendant's Motion to Dismiss*

In August 2014—six months after defendant's pleas on the assault and robbery charges—the victim died. The medical examiner determined that his death was the result of complications from his head injuries during the assault.

The state then pursued homicide charges against defendant and Jimenez. In 2015, a grand jury issued separate indictments against them. Each was charged with murder, ORS 163.115, and manslaughter in the first degree, ORS 163.118. Their cases were consolidated, and defendant and Jimenez filed motions to dismiss. Defendant's motion to dismiss was based on two grounds: (1) protections against former and double jeopardy barred the prosecution and (2) the homicide charges violated the plea agreement. Only the latter ground is at issue on appeal.

The trial court held an evidentiary hearing on defendant's motion to dismiss. The prosecutor who had handled defendant's plea agreement and the Jimenez trial was the state's primary witness. She testified that, when she initiated the prosecution of defendant in early August 2013, she had information about the victim's condition from law enforcement. She knew then that the victim "was severely injured" and "there was some question at that point" about whether he was likely to live because of the severity of his injuries. By the time of the indictment later in August, the prosecutor had spoken with the victim's family and knew that his injuries were severe and there was "going to be quite a bit of aftercare"; however, she did not know that the victim would die. At the time of the first settlement conference, she was getting information from the victim's father and knew that the victim was still living but with limited mobility and limited speech. She explained that what would

happen should the victim die was not discussed during the prosecution of either of the codefendants. She also testified that, at the time of defendant's plea and sentencing hearing and then later in the Jimenez proceedings, she "didn't know what was going to ultimately happen" to the victim or that he was "likely to die within a finite period of time."

The victim's brother also testified for the state regarding the victim's health and medical status at various stages in the case. He noted that the victim was conscious but not speaking at the time of defendant's sentencing. The family was still hoping to see more improvement in his condition then; however, by the time of the Jimenez trial, the victim's condition had come to a plateau. He further explained that, in August 2014, his family decided to use hospice care for the victim, and the victim died within three or four days.

Both the state and defendant introduced portions of the transcript of the Jimenez trial as exhibits. The state also introduced other documents concerning defendant's and Jimenez's assault and robbery cases, including transcripts and documents relating to defendant's pleas.

D. *The Trial Court's Ruling and Order of Dismissal*

The trial court stated findings on the record. The court found that the victim was "severely injured and that the state knew at the time of the assault and at the time of filing \*\*\* charges that he could die—possibly die from his injuries." It also found that, when defendant pleaded guilty and no contest to the assault and robbery charges pursuant to the plea negotiations, the "plea agreement did not specifically address whether [defendant] would be subject to further prosecution if [the victim] later died." There was "no discussion during the course of the [Jimenez] trial whether [defendant] would be offered immunity or anything else for his testimony[.]" Defendant had testified at the Jimenez trial "apparently in the reliance that this case was concluded when he had entered his pleas and that he was not subject to further prosecution." In fact, "the prosecutor at that time indicated that [defendant] had satisfied his obligations to the state and that he was not at risk of further prosecution." The court further found that the victim died

because of injuries he sustained in the 2013 assault and that "it was reasonably foreseeable that [the victim] would die as a result of the injuries he sustained in that assault."

The court also issued its ruling on the motions from the bench. Although it concluded that former and double jeopardy did not bar the homicide prosecutions of defendant and Jimenez, the court granted defendant's motion based on his arguments related to his plea agreement. The court determined as a matter of law that, in circumstances like these, the better practice was to follow the rule from other states that had reviewed plea agreements that were silent on what would happen if the victim later died. That rule required dismissal because the state had failed to reserve its right to bring further charges against defendant should the victim die.

The court subsequently entered a written order dismissing the case that contained similar and additional findings and legal conclusions. The court found that the "state was aware at the time of the charges that [the victim] could die as a result of his injuries"; during "plea negotiations, the state did not specifically preserve the right to bring more serious charges" against defendant; "defendant gave up rights that may have resulted in his acquittal with the belief that he was terminating this incident"; and defendant "was not advised that his testimony could be used against him in a future criminal matter." The court explained that defendant's out-of-state authorities were persuasive and that, because the victim's death had been reasonably foreseeable at the time of the plea negotiations, the state was obligated to affirmatively reserve the right to bring future charges and to inform defendant that the agreement would not preclude future prosecution. The state assigns error to the order of dismissal.

## II.  ANALYSIS

On appeal, both parties point to the omission of any mention in either the plea negotiations or the plea agreement of the state's possible reprosecution of defendant should the victim die. Then, using different sets of legal principles, the parties draw contradictory conclusions from that omission.

The state contends that, although it did not reserve the right to prosecute defendant for murder and manslaughter, such a reservation is not necessary under Oregon law. Its view is that it retained the right to prosecute defendant absent an express agreement with him to the contrary. In large part, the state's argument depends on its normal discretion to prosecute a defendant for homicide long after the causal event occurred and the absence of any statute or case law banning such prosecution. The state also relies on principles of contract interpretation found in Oregon's common law of contracts. According to the state, the onus was on defendant and his legal counsel to recognize the risk of the victim's later death—and the subsequent possibility of a homicide prosecution—during the negotiation and crafting of the plea agreement and, concomitantly, to address those risks in the plea agreement. Thus, in the state's view, the trial court erred by dismissing the indictment.

Defendant argues that the trial court's ruling can be explained and justified by reference to contract law, coupled with due regard for the standards required for a criminal defendant's knowing and voluntary waiver of trial-related constitutional rights. In particular, defendant views the trial court's ruling—that the state was precluded from reprosecuting defendant unless it disclosed during plea negotiations or in the plea agreement itself that it might bring homicide charges should the victim die—as embodying a default rule, as that term is understood in contract law. When a court supplies a missing term based upon a default rule, the implied contract term is based not upon the actual intent of the parties but instead on a legal rule. Peter Linzer, 6 *Corbin on Contracts* § 26.1, 400 (Joseph M. Perillo rev ed 2010) (implied term based on a default rule "may come directly from the law, regardless of the parties' intent"). In this case, defendant urges this court to approve a default rule that arises in the face of the parties' silence concerning the state's reprosecution of a defendant should the victim die: the state will bear the risk of the victim's death and cannot reprosecute the defendant for homicide.

For the reasons explained below, we conclude that, in the absence of a statutory rule specifically addressing the

issue, a contractual default rule or "gap-filler" is required when (1) the victim's death is reasonably foreseeable to the prosecutor and (2) the plea agreement does not address the subject of reprosecution in the event of the victim's death and arose from negotiations that also did not address that subject. That default rule, which requires the state to disclose that it may reprosecute the defendant should the victim die, is derived both from contract law and from respect for the criminal defendant's bargain and waiver of trial-related constitutional rights.

A.   *Contract Omissions*

We begin by identifying the salient principles of contract law that apply to the plea agreement. That threshold issue depends on the nature of the contract problem before us, an issue that the parties dispute. We agree with defendant that this case is best understood as one of contract omission.

The state cites *Yogman v. Parrott*, 325 Or 358, 361, 363-64, 937 P2d 1019 (1997), to explain that a court first examines the text of a disputed contract provision, and then, if an ambiguity exists, considers extrinsic evidence to determine the parties' intent. The state then observes that the plea agreement contained no prosecutorial promise— either express or implied—to refrain from bringing homicide charges if the victim died, and it did not otherwise refer to the possibility of the victim's death. And, in the memorializing plea petition, defendant confirmed that the prosecutor had made no promises (other than any stated in open court) to induce the plea. Given those features—particularly the omission of any term concerning the possibility of the victim's death—the state reads the plea agreement as plainly permitting it to reprosecute defendant for homicide.

But as defendant points out, the parties are not arguing about the meaning of a word or phrase or the operation of unclear provisions in the plea agreement. Although the state is correct that the plea agreement does not address the victim's death or defendant's reprosecution, the principles of contract interpretation that the state cites would neatly apply in the case of a contract term that has a disputed meaning. As we have recognized before, *Yogman* provides

an analytical "framework for contract interpretation." *Peace River Seed Co-Op v. Proseeds Marketing, Inc.,* 355 Or 44, 65, 322 P3d 531 (2014). That analytical framework works well when the proper understanding of a contractual provision is at issue. *See Williams v. RJ Reynolds Tobacco Company,* 351 Or 368, 379, 271 P3d 103 (2011) (citing *Yogman* and explaining that, to "resolve a dispute over the meaning of a contractual provision, this court first considers the text of the disputed provision in the context of the contract as a whole to determine whether the disputed provision is ambiguous"); *James v. Clackamas County,* 353 Or 431, 442, 299 P3d 526 (2013) (applying *Yogman* textual analysis after identifying the "interpretive issue" in the case). Professor Farnsworth explains that the contract problems in those types of cases can be characterized as disputes over expression, because of vagueness or ambiguity in the terms the parties used. E. Allan Farnsworth, *Disputes Over Omission in Contracts*, 68 Colum L Rev 860, 860 (1968).

In contrast, as defendant argues, the contract problem in this case concerns the effect of a contract omission. The parties' oral contract omits any mention of the contingency at issue, which the trial court found was reasonably foreseeable: that the victim would die after the parties entered into the plea agreement. Farnsworth describes that kind of contract problem as a dispute over omission, that is, a dispute over what the parties did not say and "the effect of their contract on a situation for which they have failed to provide." *Id*. We agree with that characterization of the contract issue.

B.   *Contractual Default Rules Generally*

When contracts are incomplete because the parties have not bargained concerning a term that is essential to determining their rights and obligations, so-called default rules are sometimes employed by courts to supply the missing term. E. Allan Farnsworth, 2 *Farnsworth on Contracts* § 7.16, 346 (3d ed 2004) (the rules that are the source of contract terms deemed to apply as a matter of law are commonly called default rules). In those instances, the parties' silence functions as the equivalent of assent to a default rule. *See* Farnsworth, 2 *Farnsworth on Contracts* § 7.16 at 351-52.

One commentator describes the "default rule" approach in contract omission cases by analogizing to word-processing programs that have preset margins that might be changed:

> "A word-processing program that required us to set every variable needed to write a page of text would be more trouble than it was worth. Instead, all word-processing programs provide default settings for such variables as margins, type fonts, and line spacing and leave it to the user to change any of these default settings to better suit his or her purposes."

Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 Va L Rev 821, 824 (1992). Thus, a default rule is just that. Parties to a contract may expressly agree on terms that are the subject of a default rule and that are contrary to it. *See* Farnsworth, 2 *Farnsworth on Contracts* § 7.16 at 346; Linzer, 6 *Corbin on Contracts* § 26.3 at 426.

As defendant points out, this court has imposed contractual default rules before—albeit couched as "implied" terms—to account for an omission in the contract. In *Browne & Co. v. John P. Sharkey Co.*, 58 Or 480, 482, 115 P 156 (1911), for example, when a contract was silent as to the time of performance, this court applied a default rule that performance must be completed within reasonable time. In *Kamin v. Kuhnau*, 232 Or 139, 143-44, 374 P2d 912 (1962), the plaintiff inventor paid the defendant to use his machine shop to develop his ideas for a new garbage truck packer, and the defendant subsequently manufactured a number of the developed units for the plaintiff before announcing that he would manufacture garbage truck bodies in competition with the plaintiff. This court found an implied agreement by the defendant not to appropriate the plaintiff's product ideas, regardless of whether the plaintiff could establish that the defendant had expressly agreed on that point, "as a legal conclusion recognizing the need for ethical practices in the commercial world." *Id.* at 152. Similarly, in *Perkins v. Standard Oil Co.*, 235 Or 7, 16-18, 383 P2d 107 (1963), this court imposed an "implied" condition of the contract that restricted the defendant from soliciting plaintiff's customers.

Default rules may be based on, among other things, common practices and usages regularly observed in transactions in particular areas and, as defendant notes, "basic principles of justice." *See* Farnsworth, 1 *Farnsworth on Contracts* § 1.10 at 64. Courts determining what default rule to apply, Farnsworth counsels, should not rely on "hypothetical expectations or fictitious intentions, but [on] basic principles of justice that guide a court in extrapolating from the situations for which the parties provided to the one for which they did not." Farnsworth, 2 *Farnsworth on Contracts* § 7.16 at 351. In addition, a court may "consider the realities of the negotiating and drafting processes and supply a term that will put the burden of expression on the party that can better cope with it because of bargaining power and drafting skill." *Id.* at 353.

C.   *Assuming the Risk of the Victim's Death*

With that understanding of the contract problem presented, we turn to what Oregon law should provide given the contract omission in the plea agreement. In the state's view, because the plea agreement is silent, it may reprosecute defendant. We begin with the state's two-pronged argument that no contractual default rule is appropriate for the omission. The state's argument is based in part on contract law and in part on Oregon statutes concerning plea agreements.

In its reply brief, the state contends that *Smith Tug v. Columbia-Pac. Towing*, 250 Or 612, 443 P2d 205 (1968), provides the answer under Oregon's common law of contracts. Under the holding of *Smith Tug*, the state argues, if a risk is foreseeable, then the absence of any contractual provision about the risk "gives rise to the inference that the risk was assumed." *Id.* at 643. The state observes, and defendant does not disagree, that the state's decision to prosecute defendant for the victim's death after the initial prosecution for assault and robbery would violate neither statutory nor constitutional jeopardy protections,[1] and the state contends

---

[1] *See* ORS 131.525(1)(d) (subsequent prosecution not barred for offense not consummated when former prosecution began); Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Procedure Code, Final Draft and Report, § 28, 22 (Nov 1972) (explaining that statute as permitting later prosecution when harm occurs after prior prosecution for same criminal episode; for

that the otherwise lawful prosecution of defendant should not be barred by a contract omission. Although the state does not expressly say so, its argument implies that defendant, and not the state, assumed the risk of the victim's death.

The state's reliance on *Smith Tug* is unpersuasive, for two reasons. First, as the state acknowledges, the trial court determined, and the record reflects, that it was reasonably foreseeable *to the state* that the victim would die from his injuries during the assault. There is no evidence that the victim's death was foreseeable to defendant and his counsel, and the trial court made no parallel determination as to the knowledge that defendant and his counsel possessed about the victim. And because of that factual problem, the state's argument faces a second difficulty: because the victim's death was foreseeable to the state, to the extent that *Smith Tug* applies to the circumstances here, that case may suggest that the state, not defendant, assumed the risk of the victim's death.[2]

In addition to its contract law argument, the state also relies on two statutes. Citing ORS 135.405, the state argues that silence in a plea agreement about future prosecution is not a promise by the prosecutor to refrain from future prosecution. That statute provides, in part:

"(1)  In cases [meeting certain criteria], the district attorney may engage in plea discussions for the purpose of reaching a plea agreement.

"* * * * *

___

example, when a defendant is prosecuted for reckless driving and the victim later dies, subsequent negligent homicide prosecution is permitted); *see also State v. Farley*, 301 Or 668, 672, 725 P2d 359 (1986) (explaining what constitutes prohibited subsequent prosecution for "same offense" under Article I, section 12).

[2] *Smith Tug* concerned whether the high bidder for a five-year lease of submersible land in the Columbia River from the state for the purpose of mooring logs had submitted an invalid bid by adding a contingency—that the lease would terminate if the bidder failed to obtain a permit to erect pilings for the moorage— that did not substantially conform to the invitation for bids. 250 Or at 638-40. In concluding that the variation was substantial and rejecting the bidder's argument that its contingency was reasonable, this court explained that the contingency was "so obvious and material" that the absence of the contingency from the bid would reflect an assumption of the risk, probably explaining at least in part why the other bidder, who had not included the contingency, had refused to bid more than $2,900 for the lease term when the high bid was $75,000. 250 Or at 640-41, 643.

"(3)   The district attorney in reaching a plea agreement may agree to, but is not limited to, one or more of the following, as required by the circumstances of the individual case:

"* * * * *

"(c)   To seek or not to oppose dismissal of other charges or to refrain from bringing potential charges if the defendant enters a plea of guilty or no contest to the offense charged."

The state characterizes the phrase "refrain from bringing potential charges" in paragraph (3)(c) as specifically contemplating that a prosecutor may promise not to bring future charges, but, if not, nothing precludes a later prosecution based on new facts. The second statute identified by the state provides that a defense attorney has a duty to aid the client in reaching a decision concerning a potential plea agreement, which in the state's view cuts against the argument that a default rule should favor defendants. *See* ORS 135.425(2) ("To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, shall advise the defendant of the alternatives available and of factors considered important by the defense counsel or the defendant in reaching a decision.").

We conclude that neither statute is dispositive. The first, ORS 135.405, is one of the statutes that govern a district attorney's authority to conduct plea discussions with a defendant. *Rise v. Board of Parole*, 304 Or 385, 390, 745 P2d 1210 (1987). As this court explained in *Heisser*, 350 Or at 22, under the authority of ORS 135.405(3), as "part of a plea agreement, the prosecutor may give concessions to the defendant in exchange for a plea of guilty or no contest." *See also* Commentary to Criminal Law Revision Commission, Proposed Criminal Procedure Code, Final Draft and Report § 263 at 158 (November 1972) ("Subsection (3) sets forth the types of concessions that the district attorney may make in reaching a plea agreement. Under paragraph (c) the district attorney may agree * * * to refrain from bringing potential charges against the defendant *or a third person*." (Emphasis in original.)).

We agree with the state that, by providing the district attorney with the authority to make concessions, ORS

135.405(3) plainly does not equate an agreement's omission as to future prosecution with the district attorney's promise to refrain from future prosecution. However, at the same time, the provision of authority to the district attorney to make concessions to secure a plea agreement in ORS 135.405(3) plainly does not speak to whether a contractual default rule may address an omission as to future prosecution if the victim later dies.

The legislative history of ORS 135.405 supports that reading. In adopting section 263 of the proposed criminal procedure code, which later was codified as ORS 135.405, *see* Oregon Laws 1973, chapter 836, section 170, the Criminal Law Revision Commission recognized that "the plea negotiation process should be formally recognized and controlled." Commentary § 263 at 158. The commission observed that the United States Supreme Court had described plea bargaining as "an essential component of the administration of justice," leading "to prompt and largely final disposition of most criminal cases." Commentary § 263 at 159 (quoting *Santobello v. New York*, 404 US 257, 260-61, 92 S Ct 495, 30 L Ed 2d 427 (1971)).

When drafting section 263, the commission took note of recommendations contained in a then-recent law review article addressing plea bargaining in Oregon. Commentary § 263 at 158. Those recommendations included promoting public awareness and openness of plea bargaining; reducing "the possibility of errors" and "defendant misunderstanding"; in cases involving indigent defendants, minimizing "the effect of financial pressures tempting the established attorney to bargain quickly and the marginal attorney to bargain not at all"; and uncovering "errors of an attorney." *Id.* at 158-59.

Overall, the legislative history indicates that section 263 was part of an effort to increase openness and fairness in the plea bargaining process that included consideration of the interests of indigent defendants in the criminal justice system. That effort included other provisions instructing trial courts to oversee pleas. *See* ORS 135.385(1) (addressing trial court's obligation to determine that the defendant understands the nature of the charge); ORS 135.390(1)

(addressing trial court's obligation to determine that the plea is voluntarily and intelligently made); ORS 135.395 (addressing trial court's obligation to ensure that there is a factual basis for the plea of guilty or no contest). We therefore reject the suggestion that ORS 135.405(3) effectively functions as an implied statutory bar to the contractual default rule that the trial court applied in this case.

As for the second statute the state cites, ORS 135.425(2), the state argues that responsibility for advising the defendant of the consequences of a plea agreement rests not at all with the prosecutor, but with defense counsel, as well as the trial court. If both the trial court and defense counsel fail to recognize the potential for the victim's death and the possibility that new homicide charges could be asserted against the defendant as a consequence of the death, then, according to the state, a defendant's remedy lies in post-conviction relief. Therefore, the state concludes, a contractual default rule in favor of defendants is inappropriate.

As a practical matter, if we were to accept the state's position, that ultimately would result in the defendant bearing the consequences of the victim's later death in cases such as this one, despite the existence of post-conviction relief actions, ORS 138.510 to 138.686. Although ORS 135.425(2) sets out that defense counsel has a responsibility to advise a defendant of "alternatives available and of factors considered important by the defense counsel or the defendant in reaching a decision" as to a plea agreement, the state's understanding of defense counsel's role based on that statute undermines the foundation for defendant's pleas and waiver of his rights in this case when the reality of plea negotiations is considered. The state's position assumes that defense counsel has equal access to information about the victim's health and prognosis and possible intentions of the prosecutor, yet defense counsel may not stand on the same ground as the prosecutor.

In this case, for example, the record establishes that the prosecutor had information about the victim's serious medical condition and possible death; there is no evidence that defense counsel had the same information. Given that

record, the state's argument—that defendant has a remedy in post-conviction proceedings for agreeing to enter pleas to assault and robbery without knowing that potential reprosecution based on homicide charges was on the horizon—rings hollow. It is difficult to see how defense counsel could be held responsible for constitutionally inadequate representation of his client and the consequences of a failure to advise defendant of the contingent death of the victim and later prosecution when it was the prosecutor who knew that the victim's death was foreseeable.

We conclude that neither statute upon which the state relies negates the possibility that a default contractual rule should determine the effect of the plea agreement when the parties did not address the later death of the victim, but when that contingency was foreseeable to the state. And, as noted above, *Smith Tug* does not assist the state, nor does it supply a rule that takes into account the criminal law context in which the plea agreement arose.

D.   *Default Rule When the Victim's Death is Reasonably Foreseeable to the Prosecutor*

We now turn to defendant's argument that we should affirm the trial court's judgment because that court properly recognized and applied a contractual default rule to fill the gap in the plea agreement.[3] In defendant's view, the trial court properly applied a contractual default rule that accounts for a defendant's waiver of important trial rights and protects a defendant's constitutional rights in entering pleas and agreeing to convictions pursuant to a plea agreement.

---

[3] Defendant also argues that the trial court's ruling can be explained by, and affirmed based on, an "implied-in-fact" contract term derived from contractual principles and the actual expectations of the parties in entering into the plea agreement. *See Card v. Stirnweis*, 232 Or 123, 133-34, 137, 374 P2d 472 (1962) (minority shareholder's option to purchase shares of majority shareholder upon his death must be considered in light of the parties' purpose, which was not "put fully into writing," to provide surviving shareholder ability to "prevent an unsatisfactory heir or distributee from sharing with him in the future conduct of the business"; thus, option agreement implicitly required survivor to be shareholder at time he exercised option). However, the state argues that that argument is unpreserved, and we do not reach the "implied-in-fact" theory, because we decide the case on defendant's theory that a default legal rule applies in the circumstances.

We agree, in light of the constitutional rights that a defendant gives up when entering into a plea agreement and the requirement that the defendant waive those rights knowingly, the knowledge that the prosecutor possessed that made the victim's death reasonably foreseeable to her, the necessity of allocating the risk, and the certainty that the default rule promotes. We approve a default rule that places the burden on the state—when it is reasonably foreseeable to the prosecutor that the victim may die and the state intends to reserve the right to reprosecute a defendant for homicide in the event of the victim's death—to disclose its intention to the defendant as part of the plea deal, either expressly during negotiations or, preferably, as a term of the plea agreement itself.

Principles of criminal law are important to our conclusion. As we observed at the outset, a criminal defendant's rights—not ordinarily present in a commercial contract setting—must inform the analysis and implementation of a plea agreement. *Heisser*, 350 Or at 23. When, as here, a criminal defendant enters pleas of guilty and no contest to charges in accordance with a plea agreement and is convicted, his or her pleas implicate state constitutional rights, *see* Article I, sections 11 and 12, of the Oregon Constitution, and rights under the Fifth and Sixth Amendments to the federal constitution. A criminal defendant entering such pleas waives the constitutional rights to a jury trial, to confront accusers, and to assert the privilege against compulsory self-incrimination. *Lyons v. Pearce*, 298 Or 554, 559, 694 P2d 969 (1985); *McCarthy v. United States*, 394 US 459, 466, 89 S Ct 1166, 22 L Ed 2d 418 (1969), *superseded by rule on other grounds, see, e.g., United States v. Cross*, 57 F3d 588, 591 (7th Cir), *cert den*, 516 US 955 (1995) (describing change to Fed R Crim P 11); *see also* ORS 135.385(2) (the court must inform the defendant that a plea involves waiving those rights). And defendants waiving their constitutional rights must understand the rights being waived and must do so free from coercion. *Lyons*, 298 Or at 560; *see also Dixon v. Gladden*, 250 Or 580, 584, 444 P2d 11 (1968) (a valid guilty plea is "entirely voluntarily" and made by a defendant who is "competent to know the consequences" and is not "induced by fear, misapprehension, persuasion, promises,

inadvertence, or ignorance" (quoting *Huffman v. Alexander*, 197 Or 283, 251 P2d 87, 253 P2d 289 (1953))); ORS 135.390(1) (a court shall not accept a plea of guilty or no contest unless "the plea is voluntary and intelligently made").

We agree with defendant that the contractual default rule is grounded not only on contract law concerning omissions in agreements but also on the requirement that he knowingly waive his constitutional rights and on a due process right to enforce his plea agreement. *See Santobello*, 404 US at 262 (holding that, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such a promise must be fulfilled"); *Puckett v. United States*, 556 US 129, 137, 129 S Ct 1423, 173 L Ed 2d 266 (2009) (when "a defendant agrees to a plea bargain, the Government takes on certain obligations[,]" and if they are not met, "the defendant is entitled to seek a remedy"). A valid plea agreement "presuppose[s] fairness in securing agreement between an accused and a prosecutor." *Santobello*, 404 US at 261.

We also note that courts in other jurisdictions have reached the same outcome on similar facts, based in large part on the importance of a prosecutor's plainly stated intentions regarding future prosecution, to ensure that a defendant is aware of the actual value of those promises and his or her own concessions and waivers of trial-related rights. For example, in *State v. Dye*, 127 Ohio St 3d 357, 358, 939 NE2d 1217, 1219 (2010), the defendant struck a boy with his truck, which he was driving while intoxicated and with a suspended driver's license. The boy was severely injured, and Dye was charged with, and pleaded guilty to, aggravated vehicular assault and driving under the influence. *Id.* The state did not reserve a right to file additional charges should the boy die, but the boy later died from complications of his injuries. *Id.* at 358-59, 939 NE2d at 1220. The Ohio Supreme Court explained that its own prior case, *State v. Carpenter*, 68 Ohio St 3d 59, 623 NE2d 66 (1993), *reh'g den*, 68 Ohio St 3d 1448, 626 NE2d 689, *cert den*, 513 US 1236 (1994), and cases from other states, underscore that "effect must be given to the intention of the state and the defendant in their plea bargain, and courts should enforce what

they perceive to be the terms of the original plea agreement." *Dye*, 127 Ohio St 3d at 362, 939 NE2d at 1222. The court concluded that, "without an expressed reservation by the state of the right to prosecute for any later homicide charge, Dye had a reasonable expectation that his plea of guilty would end criminal prosecution based on this incident" and that requiring the state to express its reservation "places no unreasonable burden on prosecutors and ensures that defendants are fully aware of the consequences of their guilty pleas." *Id.* at 363, 939 NE2d at 1223. *See also State v. Rivers*, 283 Conn 713, 726, 931 A2d 185, 193 (2007) (terms of plea agreements should be stated clearly and unambiguously, so that defendant knows what is expected from him and what to expect in return); *State v. Thomas*, 61 NJ 314, 323, 294 A2d 57, 62 (1972) ("we are convinced that the defendant anticipated that by pleading guilty to atrocious assault and battery, and then serving whatever sentence might be imposed, he was terminating the incident," that "this expectation was entirely reasonable and justified," and that "in pressing the presently pending murder charge, the State is doing violence to its agreement, and is seeking to deprive the defendant of something for which he legitimately bargained"). Courts in other jurisdictions have also relied, in part, on *Santobello* to caution that disposition of charges by plea bargain must be grounded in essential fairness, *Thomas*, 61 NJ at 322-23, 294 A2d at 61-62, and "must be attended by safeguards to insure the defendant what is reasonably due in the circumstances." *Carpenter*, 68 Ohio St 3d at 61, 623 NE2d at 68.

To be clear, this is not a case in which defendant seeks to undo or rescind the plea agreement based on misapprehension of or lack of voluntary assent to its terms. Rather, defendant ultimately seeks to enforce the plea agreement as he understood it. Through the plea agreement in this case, defendant gave up his trial-related constitutional rights and agreed to serve a lengthy, 120-month term in prison. He did so, the trial court found, "with the belief that he was terminating this incident" and any future prosecution.[4] When,

---

[4] Defendant received two benefits from his negotiated agreement—a firm sentence and the ability to appeal a merger issue. Both, defendant notes, are "meaningless if the state is allowed to proceed on manslaughter and felony murder

at the time of the plea agreement, the victim's death was reasonably foreseeable to the state, then putting the burden of expression on the state to disclose the risk of the victim's death and its reservation of the right to reprosecute in that event provides a reasonable safeguard for defendants waiving constitutional rights and creates certainty concerning who bears the risk. In this case, the prosecutor was aware of facts concerning the victim's health through the prosecutor's relationship with the victim's family, the police, and the victim's medical providers, who testified for the state. In accordance with the trial court's conclusion, the victim's death was reasonably foreseeable to the prosecutor.

As the United States Supreme Court has more recently stated in regard to plea agreements, "the reality [is] that criminal justice today is for the most part a system of pleas, not a system of trials." *Lafler v. Cooper*, 566 US 156, 170, 132 S Ct 1376, 1388, 183 L Ed 2d 398 (2012). This court has recognized that "plea agreements are crucial to the proper functioning of the criminal justice system." *Heisser*, 350 Or at 21.

In such a system of pleas, prosecutors have an incentive to cooperate in ensuring that defendants have access to basic information that would satisfy the requirement that they intelligently enter a plea agreement and waive their rights: the reliability of the plea agreement, because the defendant understood it and knowingly and intelligently

---

charges." The detriment to him flowing from the plea agreement increased with the homicide charges, he explains, because "his confession to assault has now become a virtual confession to manslaughter" and an admission of an element of first-degree robbery, which in turn is an element of felony murder, as well. Moreover, defendant adds, after the plea negotiations, he further exposed himself by testifying at codefendant's trial, taking full responsibility for the assault, without understanding that his testimony could be used against him in a future prosecution. Although it may not always be the case, as defendant argues, that, when the prosecutor "does not mention potential additional charges during plea negotiations, a defendant may reasonably expect that the state is satisfied with the charges currently pending against defendant and will not file additional charges after he pleads guilty or no contest," the plea agreement in this case provides a benefit to defendant only if he were not reprosecuted for homicide if the victim died. *See State v. Lordan*, 116 NH 479, 481, 363 A2d 201, 203 (1976) ("The submission and acceptance of the defendant's pleas to the first three indictments must have contemplated that no further charges would be brought, for the defendant by his pleas deprived himself of any meaningful defense to the present charges.").

accepted it. Among defense counsel, the court, and the prosecutor in this case, it was the prosecutor who was in the best position to foresee and predict that the victim could die, and it was the prosecutor who would likely reprosecute defendant for homicide. The default rule we approve in this case encourages the prosecutor to disclose that risk and potential reprosecution. The burden of the default rule on the state is not onerous, as counsel for the state acknowledged at oral argument. Indeed, an example of a plea agreement with a reservation of the right to reprosecute for homicide if the victim were to die can be found in *State v. Kephart*, 320 Or 433, 437, 887 P2d 774 (1994), *superseded by statute on other grounds as stated in [State v. Albrich](#)*, 157 Or App 64, 66-67, 969 P2d 1033 (1998).[5] Accordingly, we affirm the trial court's dismissal of the case.

The judgment of the circuit court is affirmed.

---

[5] The written plea agreement in that case included the following provision:

"The State agrees not to file other charges concerning criminal behavior concerning [the victims] *with the following exception*. This agreement does not prohibit the State of Oregon from charging the defendant with Aggravated Murder, Murder, or any other degree of criminal homicide should [one of the victims] die from injuries suffered \*\*\* from conduct of the defendant. This agreement *does not* limit the Court's right to sentence the defendant to any term authorized by statute in the event that charges are filed against the defendant for the death of [one of the victims]. This agreement does not limit the right to the defendant to raise any appropriate legal challenges to the filing of any degree of criminal homicide for the death of [the victim]."

320 Or at 437 (emphasis in original).