NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 32

No. 23-AP-079

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Orleans Unit, |
| | Criminal Division |
| | |
| Jason Roberts | September Term, 2023 |

Michael S. Kupersmith (Ret.), J.

Evan Meenan, Deputy State's Attorney, Montpelier, for Plaintiff-Appellant.

Matthew Valerio, Defender General, and A. Alexander Donn, Appellate Defender, Montpelier, for Defendant-Appellee.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **REIBER, C.J.** The State appeals the trial court's dismissal of a second-degree murder charge against defendant based on the common-law year-and-a-day rule, under which "no defendant could be convicted of murder unless his victim had died by the defendant's act within a year and a day of the act." Rogers v. Tennessee, 532 U.S. 451, 453 (2001). The rule arose to protect defendants from a murder conviction where the lapse of time made it difficult to prove that the defendant's actions caused the death. We conclude that justifications for the rule are no longer germane and, consequently, abrogate it. Consistent with our precedents and the U.S. Supreme Court's decision in Rogers, we apply our abrogation to the instant case, retroactively and prospectively. Because we reverse the court's ruling on the year-and-a-day rule, we also address defendant's alternative arguments that the court erred in finding that the prosecution is not barred by the Double Jeopardy Clause or defendant's plea agreement. We find no error and affirm those

aspects of the court's ruling. Finally, because the trial court has not yet ruled on the issue, we do not reach defendant's contention that the State cannot make out its prima facie case. Accordingly, we reverse the court's dismissal of the charges and remand for further proceedings.

¶ 2. The undisputed facts are as follows. In 2001, defendant shook his five-week-old daughter, D.R., causing her severe neurological injuries. Defendant was charged with aggravated domestic assault, 13 V.S.A. § 1043(a)(1), and ultimately pleaded nolo contendere to the charge, serving ten years of a fifteen-year maximum sentence.[1] Defendant's plea agreement provided that the "State will not bring any further charges that are on file at this time." Meanwhile, D.R. was placed in foster care and later adopted, assuming the name M.S. In 2016, at age fifteen, M.S. died from complications ostensibly resulting from the injuries she received when shaken as an infant by defendant.

¶ 3. In 2022, the State charged defendant with second-degree murder, 13 V.S.A. § 2301, relating to M.S.'s death. Defendant moved to dismiss the charge, claiming that the State could not make out its prima facie case and that the prosecution was barred by the common-law year-and-a-day rule, the Double Jeopardy Clause, and his plea agreement. The trial court withheld judgment on the prima-facie-case issue, noting that "[t]he parties agreed that the court should decide" the other issues initially "and reserve the first point for a later time." The court then rejected the double-jeopardy and plea-agreement claims, concluding that double jeopardy did not apply and that the express terms of defendant's plea agreement did not bar the prosecution. However, the court determined that the year-and-a-day rule was still part of the common law of Vermont and that the death had occurred more than a year and a day after defendant's act, and therefore dismissed the murder charge. This appeal by the State followed. We begin by addressing the year-and-a-day rule.

---

[1] At oral argument, defendant referred to the assault as "alleged." Defendant pleaded nolo contendere to the assault, and therefore his crime can no longer rightly be called alleged.

## I. The Year-and-a-Day Rule

¶ 4.     The State presents three related reasons why the year-and-a-day rule should not apply. First, the State disputes whether the year-and-a-day rule remains a part of Vermont common law and argues principally that the Legislature abrogated the rule when it codified murder without establishing a limitations period. Second, the State claims this Court should abrogate the rule if it still exists. Third, assuming we abrogate the rule, the State argues that we should apply that abrogation to this case, permitting the prosecution to proceed. We examine each of these issues in turn.

¶ 5.     The existence and application of the year-and-a-day rule under Vermont common law are legal questions that we review without deference to the trial court's conclusions of law. See State v. Reynolds, 2014 VT 16, ¶ 9, 196 Vt. 113, 95 A.3d 873.

### A. The Year-and-a-Day Rule Under Vermont Common Law

¶ 6.     This Court has not previously addressed the year-and-a-day rule. Cf. State v. Congress, 2014 VT 129, ¶ 74, 198 Vt. 241, 114 A.3d 1128 (mentioning year-and-a-day rule in single, passing reference in denying defendant's motion for reargument), cert. denied, 557 U.S. 843 (2015). Accordingly, we first provide a brief background on the origins of the year-and-a-day rule and its initial adoption as a part of Vermont common law. Although not in dispute, this background is helpful to contextualize the issues on appeal. We then turn to whether the Legislature has abrogated this common law rule by statute.

### i. Initial Adoption of the Rule

¶ 7.     Vermont adopted the common law of England by statute after our independence in the 1770s. See 1 V.S.A. § 271 (adopting "the common law of England" in Vermont). Because our common law embraces the "unwritten law of England, as amended or altered by acts of Parliament," that existed at the time of Vermont's founding, E.B. & A.C. Whiting Co. v. City of Burlington, 106 Vt. 446, 458, 175 A. 35, 41 (1934), a law that was "part of the common law of England" is "part of our law" under § 271, State v. O'Brien, 106 Vt. 97, 107-08, 170 A. 98, 102

3

(1934). See State v. Sylvester, 112 Vt. 202, 206, 22 A.2d 505, 508 (1941) (describing Vermont common law's foundation under common law of England as something "courts shall take notice thereof and govern themselves accordingly" (quoting 1 V.S.A. § 271) (emphasis added)).[2]

¶ 8.    The year-and-a-day rule formed a part of the common law of England, both by custom and by statute, since at least 1287 with the passage of the Statute of Gloucester.  See State v. Vance, 403 S.E.2d 495, 498 (N.C. 1991); State v. Picotte, 2003 WI 42, ¶¶ 10-11, 661 N.W.2d 381.  In relevant part, the Statute mandated that appeals of murder should not be dismissed "if the party . . . sue[s] within the year and the day" after the injury that caused the victim's death occurred.  Statute of Gloucester, 6 Edw. 1, c. 9 (1278), reprinted in 1 O. Ruffhead, The Statutes at Large from Magna Charta to the End of the Parliament, 1761, at 67-68 (London, 1762).  Initially, the rule applied only in private actions.  See, e.g., YB 15 Edw. 2, fol. 463-64, Pasch., pl. 5 (1322) (Eng.) ("[T]he appellor take[s] nothing by the appeal . . . because the appeal was not [filed] . . . [within] the year and the day.").  However, the rule "eventually found its way into the criminal law" as part of the substantive, common-law definition of murder.  People v. Stevenson, 331 N.W.2d 143, 145 (Mich. 1982); Vance, 403 S.E.2d at 498.  At common law, the death of a victim within a year and a day was requisite for the victim's death to be deemed murder.  See 3 E. Coke, Institutes of the Laws of England 52 (1627) [hereinafter Institutes]; 1 M. Hale, The History of the Pleas of the Crown 428 (S. Emlyn et al., eds., Little-Britain, 1800) (1682) [hereinafter Pleas of the Crown]; 4 W. Blackstone, Commentaries *197; see, e.g., R v. Howe [1987] UKHL 8, [1987] AC 417 ("[M]urder being a 'result' crime [is] only . . . complete if the victim dies within . . .  a year and a day.").[3]

---

[2]  The language of § 271 contemplates the rejection of English common law that was either "[not] applicable to [our] local situation and circumstances" or "repugnant to the constitution." Because no such claim is made on appeal, we need not address this aspect of the statute.

[3]  In discerning aspects of common-law crimes, this Court has long relied on cases and treatises of English law, including Coke's Institutes, Hale's Pleas of the Crown, and Blackstone's Commentaries.  See e.g., State v. Croteau, 23 Vt. 14, 24 (1849) (citing Coke), overruled by State v. Burpee, 65 Vt. 1, 25 A. 964 (1892); State v. Frotten, 114 Vt. 410, 412, 46 A.2d 921, 924 (1946)

¶ 9. Because the year-and-a-day rule was part of the common law of England and because we statutorily adopted English common law, the rule became a part of Vermont law at the State's inception. See E.B. & A.C. Whiting Co., 106 Vt. at 458, 175 A. at 41; accord State v. Young, 390 A.2d 556, 557 (N.J. 1978) (per curiam) (reaching same result under New Jersey common law); State v. Pine, 524 A.2d 1104, 1107 (R.I. 1987) (reaching same result under Rhode Island common law).

### ii. Continuation of the Rule Despite Statutory Enactments

¶ 10. In Vermont, common-law rules can be abrogated by statute if done expressly via "clear and unambiguous language" or implicitly via language that is "clearly inconsistent" with the common law. Langle v. Kurkul, 146 Vt. 513, 516, 510 A.2d 1301, 1303 (1986). By consequence, the common law cannot be changed by mere "doubtful implication." State v. Levine, 117 Vt. 320, 322, 91 A.2d 678, 679 (1952). Rather, "the Legislature has the duty to define a different course from the common law." State v. Deyo, 2006 VT 120, ¶ 58, 181 Vt. 89, 915 A.2d 249 (Dooley, J., concurring in part). Otherwise, "[i]n the absence of a statute abrogating it, the common law applies." State v. Tedesco, 147 Vt. 133, 136, 513 A.2d 1164, 1166 (1986), overruled on other grounds by State v. Gallagher, 150 Vt. 341, 554 A.2d 221 (1988). When interpreting statutes and their impact on the common law, our primary goal is "to effectuate the intent of the Legislature." State v. Dimick, 173 Vt. 547, 549, 790 A.2d 435, 437 (2002) (mem.); see State v. Muxlow, 2023 VT 27, ¶ 3, __ Vt. __, 297 A.3d 941 (mem.). To determine intent, we rely principally on the statute's plain language, but "if this is insufficient . . . we consider the broad subject matter of the statute, its effects and consequences, and [its] purpose and spirit." State v. Stearns, 2022 VT 54, ¶ 7, 217 Vt. 276, 288 A.3d 173.

¶ 11. Here, neither the adoption of the murder statute, 13 V.S.A. § 2301, nor the adoption of the limitations statute, 13 V.S.A. § 4501, served to repeal of the year-and-a-day rule.

---

(citing Pleas of the Crown); State v. Provost, 2005 VT 134, ¶ 16, 179 Vt. 337, 896 A.2d 55 (citing Blackstone's Commentaries).

¶ 12. The plain language and context of § 2301 indicates that the Legislature did not clearly intend to abrogate the common-law year-and-a-day rule because it does not mention the rule and otherwise leaves the substantive definition of "murder" to the tenets of the common law. See 13 V.S.A. § 2301 (using word "murder" three times without defining it). The Legislature "in no degree altered the common-law definition of murder" when it enacted § 2301. State v. Tatro, 50 Vt. 483, 494 (1878). The common-law definition of murder, in turn, has always embraced the requirement that the death occur within a year and a day of the injury, a fact presumptively known to the Legislature when it codified § 2301. See 4 Blackstone, supra, *195; cf. Dawe v. Dr. Reuven Bar-Levav & Assocs., P.C., 780 N.W.2d 272, 277 (Mich. 2010) (observing that legislature "is presumed to know of the existence of the common law when it acts" (quotation omitted)). Since its enactment, § 2301 has remained "virtually unchanged." State v. Johnson, 158 Vt. 508, 517, 615 A.2d 132, 137 (1992). Consequently, the Legislature has neither altered this substantive definition of murder under § 2301 nor otherwise addressed or alluded to the common-law year-and-a-day rule.

¶ 13. Similarly, the plain language of the limitations period in § 4501 as well as its context and purpose indicate that the Legislature did not clearly intend to abrogate the year-and-a-day rule. No reference is made to the rule anywhere in the language of the statute. Moreover, § 4501 is procedural, whereas the year-and-a-day rule is substantive. See generally 13 V.S.A. § 4501 (listing limitations periods for crimes not including murder); State v. Delisle, 162 Vt. 293, 312, 648 A.2d 632, 644 (1994) ("Vermont has no statute of limitations for the prosecution of murder.").

¶ 14. Sources conflict as to whether the year-and-a-day rule is best classified as an element of the offense, a defense, an irrebuttable presumption, or something else entirely; all agree, however, that it is substantive. Some courts have noted that the rule has "operated like [a] . . . statute of limitations," Vance, 403 S.E.2d at 498, but this confusion arises from the rule's application both by statute in (now-abolished) private appeals of murder and at common law in

6

public murder prosecutions.  See <u>Rogers</u>, 532 U.S. at 463.[4]  Under English law, statutes of limitations applied to private prosecutions of murder.  See Statute of Gloucester, 6 Edw. I c. 9 (1278), <u>reprinted in</u> 1 Ruffhead, <u>supra</u>, at 67-68.  By contrast, there was no limitations period on prosecutions for murder at common law.  See <u>Andrews v. Stam</u>, 2007 VT 79, ¶ 8, 182 Vt. 482, 939 A.2d 455 (observing that "statutes of limitation are strictly creatures of legislative construct" and unknown at common law).  Instead, the rule was more than a mere procedural statute of limitations on private appeals of murder; it also, by at least the seventeenth century, "extended to the law governing public prosecutions for murder" and thus was a substantive part of the criminal law.  <u>Rogers</u>, 532 U.S. at 463; see 3 Coke, <u>supra</u>, at 52; see also <u>The Avery</u>, 2 F. Cas. 242, 243 (C.C.D. Mass. 1815) (No. 672) (Story, J.).[5]

¶ 15.  As part of the criminal law, the common-law year-and-a-day rule formed a substantive aspect of the offense of murder.  It was "<u>requisite</u> that the [victim] die within a year and a day," as otherwise a death could not, by definition, be murder.  4 Blackstone, <u>supra</u>, *197 (emphasis added).  Highlighting the rule's substantive purpose, English law "presume[d]" that "it could not be discerned . . . whether [the victim] died of the [injury] or of a natural death" after more than a year had elapsed.  3 Coke, <u>supra</u>, at 52.  Accordingly, the year-and-a-day rule at common law "was distinct from any question of the period of limitations for commencing a prosecution" for murder.  <u>Commonwealth v. Lewis</u>, 409 N.E.2d 771, 773 (Mass. 1980), <u>cert. denied</u>, 450 U.S. 929 (1981).  It follows that while a limitations statute like § 4501 is a procedural rule governing the time to bring the charge for a murder that has occurred, see <u>United States v.</u>

---

[4]  Private appeals of murder were abolished in England by statute in 1819.  See Appeal of Murder Act, 59 Geo. 3, c. 46 (1819), <u>reprinted in</u> 1 E. Hayes, Crimes and Punishments 29-30 (2d ed.1842).  They were never a part of the law in Vermont.  Cf. <u>State v. Averill</u>, 85 Vt. 115, 130, 81 A. 461, 466 (1911) (mentioning "appeal[s] of murder" once in passing (quotation omitted)).

[5]  Some sources argue that the rule entered the common-law definition of murder "probably through ignorance and confusion."  <u>State v. Sandridge</u>, 365 N.E.2d 898, 899 (Ohio Ct. Com. Pl. 1977).  But the precise contours of how the rule moved from merely governing private appeals of murder to a substantive aspect of criminal law is not necessary to explore here.  That the rule unquestionably did is sufficient.

Zue, 704 F. Supp. 535, 537 (D. Vt. 1988) ("Statute of limitations . . . are procedural in nature."), the year-and-a-day rule is a substantive rule indicating whether a murder had even occurred in the first place, see Lewis, 409 N.E.2d at 773. Thus, the absence of a limitations period for murder under § 4501—a procedural limitation—has no bearing on the substantive year-and-a-day rule as applied to murder at common law. See Tedesco, 147 Vt. at 136.

¶ 16. Therefore, the year-and-a-day rule continues to exist as part of the common law in Vermont and has not been statutorily abrogated by the Legislature.

### B. Abrogation of the Year-and-a-Day Rule

¶ 17. We must next consider whether the rule should remain part of our common law and, if not, whether its abrogation is a matter for the Court, or one best left to the Legislature.

### i. Authority of this Court to Abrogate the Year-and-a-Day Rule

¶ 18. It is axiomatic that this Court can exercise "the authority to make changes in the common law, should we deem it appropriate to do so." Hay v. Med. Ctr. Hosp. of Vt., 145 Vt. 533, 536-37, 496 A.2d 939, 941 (1985). We have found it appropriate to amend the common law when there is "plain justification supported by our community's ever-evolving circumstances and experiences" that reflect present "common standards." Demag v. Better Power Equip., Inc., 2014 VT 78, ¶ 14, 197 Vt. 176, 102 A.3d 1101 (quotation omitted). This tenet of Vermont law is well founded and reflects centuries of legal scholarship and judicial decision making. See Hay, 145 Vt. at 542 ("It is the role of this Court to adapt the common law to the changing needs and conditions of the people of this state."); Lutwak v. United States, 344 U.S. 604, 615 (1953) ("It has . . . become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." (quotation omitted)); Rogers, 532 U.S. at 462 ("[T]he fact of the matter is that common law courts then, as now, were deciding cases, and in doing so were fashioning and refining the law as it then existed in light of reason and experience. Due process clearly did not prohibit this process of judicial evolution at the time of the framing, and it does not do so today."); Hamdan v. Rumsfeld, 548 U.S. 557, 689 (2006) (Thomas, J.,

8

dissenting) ("[T]he common law . . . is flexible and evolutionary . . . building upon the experience of the past and taking account of the exigencies of the present."); B. Cardozo, The Nature of the Judicial Process 151-52 (1921) (observing widely-held legal scholarship position that common law "should not be stationary" and changes to common law should not be left to legislature because "[i]f judges have wo[e]fully misinterpreted the mores of their day . . . they ought not to tie, in helpless submission, the hands of their successors" (emphasis omitted)).

¶ 19.    Additionally, the Legislature has already implicitly deferred to this Court on the boundaries of murder by leaving the substantive definition of murder to common law.  See Johnson, 158 Vt. at 517, 615 A.2d at 137.  This differs from other states where courts have deferred to their legislatures to abrogate the rule.  See, e.g., State v. Minster, 486 A.2d 1197, 1197-99 (Md. 1985) (declining to "abrogate the common law rule" because it "is more appropriately addressed by the legislature.").  In many states, the legislature has taken an active role in defining homicide by statute, including removing the year-and-a-day requirement.  See, e.g., State v. Fortenberry, 197 So. 3d 786, 789-91 (La. Ct. App. 2016) (noting that state legislature codified, and later repealed, year-and-a-day rule), cert. denied, 220 So. 3d 751 (La. 2017); State v. Fabien, 302 A.3d 1037, 1054 (Md. App. Ct. 2023) (same).  But that is not the case in Vermont.  Although Vermont statutes classify various types of homicide, they do not define "murder."  See 13 V.S.A. § 2301. Rather, the Legislature effectively left murder as a common-law crime in Vermont, cf. Tatro, 50 Vt. at 494, and the year-and-a-day rule is a judicially created aspect of murder at common law. Therefore, this Court is "particularly well-suited to act" in abrogating that "judge-made rule." Stevenson, 331 N.W.2d at 146-47.

¶ 20.    Finally, the exercise of our authority to judicially alter the common-law year-and-a-day rule results in no imbalance in the proper role between this Court and the Legislature.  The Legislature wields the power to amend the common law by statute when it sees fit.  See E.B. & A.C. Whiting Co., 106 Vt. at 464, 175 A. at 44 (noting that common law can be "repealed by a

statute"). Accordingly, should the Legislature find that the year-and-a-day rule ought to be preserved, or should it find that the abrogation of the rule is so significant that it ought to be expressly codified, it could do so. Therefore, we need not defer to the Legislature on this decision.

ii. Justifications for Abrogating the Year-and-a-Day Rule

¶ 21. Other jurisdictions that have analyzed the year-and-a-day rule and its applicability to modern circumstances have articulated three traditional rationales behind it: first, and primarily, that the rule aids in the fairness and accuracy of prosecutions for murder because medical science cannot accurately determine the cause of death when the time between injury and death is lengthy; second, that the rule prevents jurors from relying on their own knowledge and speculating as to extenuated causes of death; and third, that it protects criminal defendants from the threat of capital punishment in homicide cases. See Picotte, 2003 WI 42, ¶¶ 31-33. These justifications are outmoded and no longer relevant in Vermont.

¶ 22. A supposed inability to determine the cause of death after more than a year has elapsed, as a justification for the rule, gives way in the face of modern medicine. The rule once reflected the need for maintaining accuracy and reliability and attaining justice in murder prosecutions when the rudimentary medical knowledge available made establishing causation beyond a reasonable doubt impossible after substantial time had elapsed. See Picotte, 2003 WI 42, ¶ 31; see also E. Wilbanks, The Murder Rule That Just Won't Die: The Abolished Year-And-A-Day Rule Continues to Haunt The Florida Courts, 60 Fla. L. Rev. 735, 741-42 (2008) ("Medical technology in the thirteenth century was primitive, and science was incapable of establishing beyond a reasonable doubt that an injury caused a death when a great deal of time had passed between the injury and the death."). But today, advances in medical science have so wholly undermined this rationale and supposed purpose of the rule "as to render it without question obsolete." Rogers, 532 U.S. at 463; accord Commonwealth v. Casanova, 708 N.E.2d 86, 89 (Mass. 1999) ("[A] primary factor making the . . . rule obsolete is the advance of medical knowledge.").

10

By consequence, other courts note that this primary justification for the year-and-a-day rule is now "hazy" and "highly suspect." United States v. Jackson, 528 A.2d 1211, 1220 (D.C. 1987).

¶ 23. The proper role of the jury in homicide prosecutions, as a justification for the rule, is also no longer relevant because of the use of expert testimony in modern trials. The rule once supported the function of the jury at a time when expert testimony was not permitted and jurors decided cases based on their own personal knowledge, however imperfect. Picotte, 2003 WI 42, ¶ 32. But rules of evidence today prohibit reliance on personal non-evidentiary impressions (biases), and permit jurors access to expert testimony, including on the cause of death in murder prosecutions. Id. ¶ 34. The Vermont Rules of Evidence allow expert testimony, and expert witnesses regularly testify on the nature and cause of deaths in homicide prosecutions. V.R.E. 702-706; see, e.g., State v. Brunell, 159 Vt. 1, 3, 615 A.2d 127, 128 (1992) (describing how "[t]he State called various medical experts on the cause of death" regarding child's suffocation and injuries from "shaken infant syndrome").

¶ 24. Protection for defendants from the threat of capital punishment, as a justification for the rule, is also no longer relevant in Vermont. In the past, the rule served "as an attempt to avoid the harsh result of the common law of homicides" given that "[t]hose convicted of homicide in any form . . . were subject to the death penalty" under English law. Picotte, 2003 WI 42, ¶ 33; see 4 Blackstone, supra, *13-14 (explaining death was only appropriate punishment for murder under early English law). Vermont no longer has the death penalty. In re Fellows, No. 2018-130, 2018 WL 4835000, at *3 (Vt. Sept. 28, 2018) (unpub. mem.) [https://perma.cc/6M44-KYVH]; see United States v. Fell, 571 F.3d 264, 274 (2d Cir. 2009) (mem.) (Raggi, J., concurring) ("Vermont . . . does not currently use the death penalty."), denying reh'g en banc 531 F.3d 197 (2d Cir. 2008), cert. denied, 559 U.S. 1031 (2010); see also 13 V.S.A. § 2303 (mentioning only "imprisonment" as punishment for first-degree and second-degree murder). Consequently, this Court has not reviewed, let alone upheld, a death sentence for a murder conviction since 1954, see

State v. Demag, 118 Vt. 273, 278, 108 A.2d 390, 394 (1954), obviating this ancillary justification for the rule.

¶ 25. In addition to the year-and-a-day rule's historic justifications no longer bearing weight, the rule fails as a matter of policy. As other courts have recognized, the rule's efficacy in promoting judicial fairness is arbitrary at best; the rule fails to explain why the prosecution ought to be barred from bringing a murder prosecution and attempting to prove causation where a year and a day has passed between the defendant's act and the victim's death. See Stevenson, 331 N.W.2d at 146 ("The presumption was . . . arbitrary from the beginning."); People v. Brengard, 191 N.E. 850, 853 (N.Y. 1934) ("[The rule was an] arbitrary span of time which was fixed by the common law"); State v. Sandridge, 365 N.E.2d 898, 899 (Ohio Ct. Com. Pl. 1977) ("[T]his ancient rule was nothing more than an arbitrary settlement of what may have originally been a very difficult proof of physical cause."). Additionally, the continued application of the rule could have adverse consequences given the ability for modern medical science to prolong the life of a victim of violence. Without change, the rule would permit a murderer to evade punishment simply because modern medicine kept his victim alive for more than a year.

¶ 26. For all these reasons, "the year and a day rule has been . . . abolished in the vast majority of jurisdictions . . . to have addressed the issue." Rogers, 532 U.S. at 463. By abrogating the rule, we align ourselves with this "overwhelming trend" in the law. State v. Courchesne, 998 A.2d 1, 161 (Conn. 2010) (Zarella, J., concurring in part); see Key v. State, 890 So. 2d 1043, 1046 (Ala. Crim. App. 2002) (describing abrogation of year-and-a-day rule as "[a] modern legal and judicial trend"), rev'd in part, 890 So. 2d 1056 (Ala. 2003).

¶ 27. The prudence of judicially abrogating a rule whose justifications have become obsolete is well reflected in Justice Holmes's oft-quoted speech: "[i]t is revolting to have no better reason for a rule of law than . . . it was laid down at the time of Henry IV," and "[i]t is still more revolting if the grounds upon which it was laid down have vanished long since." O. W. Holmes, The Path of the Law, Address at the Boston University School of Law (Jan. 8, 1897), in 10 Harv.

L. Rev. 457, 469 (2009).  That the year-and-a-day rule was laid down during the time of Henry IV's great-great-grandfather, Edward I, only bolsters Holmes's point.  The year-and-a-day rule is now otiose, and thus we revise the common law and abrogate it.

### C.  Retroactive Abrogation of the Year-and-a-day Rule

¶ 28.  Lastly, the question remains whether our abrogation of the year-and-a-day rule should apply to defendant in this case, thus allowing the State to prosecute him.  Our precedents favor the common-law approach to retroactivity, under which changes in the law are applied to the parties in both the case at hand and pending cases.  Because we conclude that retroactive abrogation here would not be "unexpected and indefensible" by reference to prior law, see Rogers, 532 U.S. at 462, we see no reason to depart from this ordinary approach.

¶ 29.  We have previously recognized that courts "may choose among four options" in determining the retroactive effect of a change in the law:

> (1) Make the new rule of law purely prospective, applying it only to cases whose operative facts arise after the new rule is announced; (2) apply the new rule to future cases and to the parties in the case announcing the new rule, while applying the old rule to all other pending and past litigation; (3) grant the new rule limited retroactivity, applying it to cases in (1) and (2) as well as to pending cases where the parties have not yet exhausted all avenues of direct review; and, finally (4) give the new rule complete retroactive effect, applying it to all cases, even those where final judgments have been entered and all avenues of direct review exhausted.

State v. Shattuck, 141 Vt. 523, 528-29, 450 A.2d 1122, 1124-25 (1982) (quotation omitted).  In Shattuck, we followed the U.S. Supreme Court and adopted the "common law rule . . . that a change in law will be given effect while a case is on direct review."  Id. at 529, 450 A.2d at 1125 (quoting United States v. Johnson, 457 U.S. 537, 543 (1982)).  Thus, under Shattuck, we apply changes in the law both to pending cases and to the parties in the case announcing the rule.  See id. at 528-30, 450 A.2d at 1124-25; State v. Bowen, 2018 VT 87, ¶ 6, 208 Vt. 164, 195 A.3d 361.  While Shattuck recognizes that "some changes may be appropriate on a prospective basis only,"

141 Vt. at 529-30, 450 A.2d at 1125, we have not applied a change in the common law on a purely prospective basis in any criminal case since Shattuck.

¶ 30.   Instead, we have applied this type of limited retroactivity in the overwhelming majority of cases involving changes in the common law, both civil and criminal.[6]  We have frequently applied our decisions retroactively when abrogating a common-law rule previously adopted by our court.   See, e.g., Demag, 2014 VT 78, ¶¶ 26-28 (abrogating common-law negligence distinction between licensees and invitees and remanding for reconsideration under new standard); Hilder v. St. Peter, 144 Vt. 150, 157-64, 478 A.2d 202, 206-11 (1984) (abrogating common law view of leases as conveyances of property, and affirming trial court's award of damages based on breach of implied warranty of habitability).   This is also true where we have abolished a previously recognized common-law immunity or defense.  See Foster v. Roman Cath. Diocese of Vt., 116 Vt. 124, 137-38, 70 A.2d 230, 237-38 (1950) (abrogating immunity for religious and charitable institutions and remanding to trial court); O'Brien v. Comstock Foods, Inc., 125 Vt. 158, 161-62, 212 A.2d 69, 71-72 (1965) (rejecting privity as common-law defense for injuries to consumer and remanding for reconsideration); see also State v. Peters, 141 Vt. 341, 345-47, 450 A.2d 332, 334-35 (1982) (recognizing "ambiguity and confusion" as to whether common law permitted resisting arrest made under defective warrant, but holding that to extent such rule existed, forceable resistance was no longer permitted (quotation omitted)).

¶ 31.   Our decision in Congress is illustrative of our usual approach in criminal cases.  In Congress, we considered a defendant's contention that she was entitled to a jury instruction on "diminished capacity" as an extenuating circumstance that would reduce second-degree murder to

---

[6]  We previously applied selective prospectivity—that is, applying the decision to the parties in the case at hand but not to pending cases—under some circumstances in civil cases.  See Solomon v. Atlantis Dev., Inc., 145 Vt. 70, 73-74, 483 A.2d 253, 256 (1984); see also Crabbe v. Veve Assocs., 145 Vt. 641, 643, 497 A.2d 366, 368 (1985).  However, we have since overruled this line of cases, thereby "eliminat[ing] differences between the retroactive effect of civil and criminal decisions."  Deutsche Bank Nat'l Tr. Co. v. Watts, 2017 VT 57, ¶ 20, 205 Vt. 56, 171 A.3d 392.

voluntary manslaughter. 2014 VT 129, ¶¶ 15-16. In prior cases, we had consistently made the common-law defense of diminished capacity "available to negate the specific intent necessary to commit second-degree murder." Id. ¶ 31 (quoting State v. Sexton, 2006 VT 55, ¶ 17, 180 Vt. 34, 904 A.2d 1092). But in Congress, we overruled several of our prior cases and held that diminished capacity does not reduce second-degree murder to voluntary manslaughter where specific intent is otherwise shown. Id. ¶ 34 n.4 ("To the extent that we suggested otherwise in Duff, Shaw, Wheelock, Sexton, Williams, and a host of other prior cases, we hereby overrule that aspect of those decisions.").

¶ 32. Yet even there, in revoking a common-law defense to murder that we had explicitly recognized in prior cases, we did not deviate from the retroactivity rule announced in Shattuck. If we did not apply purely prospective abrogation in Congress, where issues with reliance and fairness were far greater due to our precedents explicitly approving of the rule at issue, then we need not choose prospective abrogation here, where we have made no prior statements adopting the year-and-a-day rule.

¶ 33. Under the U.S. Supreme Court's decision in Rogers, we have no doubt that retroactive abrogation here would comport with due process. The Court in Rogers considered whether the retroactive application of a state court decision abolishing the year-and-a-day rule would violate either the Due Process or Ex Post Facto Clauses of the U.S. Constitution. 532 U.S. at 453. The Court first observed that "[t]he Ex Post Facto Clause, by its own terms, does not apply to courts." Id. at 460. Turning to the Due Process Clause, the Court determined that "a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." Id. at 462 (quotation omitted) (emphasis added). Applying this test, the Court concluded that the Tennessee court's retroactive annulment of the rule did not violate due process because the rule was an "outdated

15

relic of the common law" and "had never once served as a ground of decision in any prosecution for murder in [Tennessee]." Id. at 462, 464.

¶ 34.     These observations apply equally here. The Rogers Court's conclusion that the rule is an "outdated relic of the common law," id. at 462, has only been strengthened in the intervening years. As discussed, none of the historical justifications for the rule are relevant today, and even at its inception, the rule was inherently arbitrary. Moreover, the rule has never been the basis of any decision of this Court and has only been mentioned in passing on a single occasion in all of our prior cases. See Congress, 2014 VT 129, ¶ 74. Even that single reference was in a discussion of Rogers, not in any acknowledgement of the rule that could justify reliance by a criminal defendant.

¶ 35.     Given the near unanimity of recent state court decisions in abrogating the year-and-a-day rule, it can hardly be said that retroactive abrogation would be unexpected and indefensible by reference to prior law. "[T]he fact that a vast number of jurisdictions have abolished a rule that has so clearly outlived its purpose is surely relevant to whether the abolition of the rule in a particular case can be said to be unexpected and indefensible by reference to the law as it then existed." Rogers, 532 U.S. at 464. Thus, as in Rogers, it is clear that retroactive abrogation would not "offend[] the due process principle of fair warning," but would instead be a "routine exercise of common law decisionmaking," bringing "the law into conformity with reason and common sense." Id. at 466-67.

¶ 36.     Absent any due process concerns, we see no reason to depart from our traditional rule of retroactivity. We have long made efforts to align our law on retroactivity with that of the U.S. Supreme Court.[7] Given that retroactive abrogation aligns both with our precedents and with

_____

[7]     In both civil and criminal cases, we have consistently aligned our approach on retroactivity with developments in U.S. Supreme Court case law. See Shattuck, 141 Vt. at 529, 450 A.2d at 1125 (adopting the common-law approach to retroactivity "[f]or the reasons detailed in" United States v. Johnson, 457 U.S. 537 (1982)); Solomon, 145 Vt. at 74, 483 A.2d at 256 (holding that in civil cases, "we will apply the factors announced in" Chevron Oil Co. v. Huson, 404 U.S. 97 (1971)); Deutsche Bank Nat'l Tr. Co., 2017 VT 57, ¶ 20 (overruling Solomon and

16

directly applicable U.S. Supreme Court precedent, we decline defendant's request to "hold that Article 10 of the Vermont Constitution offers greater protection than the Due Process Clause of the United States Constitution" in this context.

¶ 37. We also reject defendant's argument that the underlying facts here are so fundamentally unfair that we should apply prospective abrogation even absent any due process violation. As the U.S. Supreme Court has explained, "we can scarcely permit the substantive law to shift and spring according to the particular equities of individual parties' claims of actual reliance on an old rule and of harm from a retroactive application of the new rule." Harper v. Va. Dep't of Tax'n , 509 U.S. 86, 98 (1993) (quotations and alterations omitted); see also James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 543 (1991) (plurality opinion).[8] We conclude here that, under Rogers, prosecution would not violate due process, and as discussed in greater detail below, we also conclude that prosecution is not barred by the Double Jeopardy Clause or the 2002 plea agreement. Absent a violation of any substantive provision of law, applying purely prospective abrogation here risks arbitrariness, opening the door to case-by-case decisions down the road.

¶ 38. While defendant is correct that most other state courts that have previously considered this issue have abrogated the rule on a purely prospective basis, all but one of these cases were decided prior to Rogers and were grounded in ex-post-facto or due-process principles.[9]

---

adopting new approach from Harper v. Va. Dep't of Tax'n, 509 U.S. 86 (1993), to "keep our law on this subject consistent with that announced by the U.S. Supreme Court").

[8] The dissent suggests that our citations to Harper and Beam are taken out of context because those cases call for retroactive application on matters of federal law, whereas states remain free to choose prospective application on matters of state law. We do not dispute that we have the authority to abrogate the year-and-a-day rule prospectively. See Picotte, 2003 WI 42, ¶ 41. However, given the holding in Rogers and our general approach on retroactivity, we are unpersuaded that we should exercise that authority under the facts of this case.

[9] See Young, 390 A.2d at 560 ("If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."); Lewis, 409 N.E.2d at 775 ("We believe the selection of such a cleavage date comports with the [E]x [P]ost [F]acto

17

Since <u>Rogers</u> clarified that retroactive abrogation of the year-and-a-day rule does not violate the Ex Post Facto or Due Process Clauses, these decisions have little relevance.

¶ 39. The only post-<u>Rogers</u> decision to abrogate the rule on a purely prospective basis was the Wisconsin Supreme Court's decision in <u>Picotte</u>. As an initial matter, that decision may be distinguished on state law grounds; unlike Wisconsin, which has employed a doctrine of "prospective overruling, or 'sunbursting,' to soften or limit the impact of a newly announced rule," <u>id</u>. ¶ 43, we apply the common-law rule of retroactivity and have never overruled a criminal rule on a prospective basis. See <u>supra</u>, ¶¶ 29-32.

¶ 40. More fundamentally though, the <u>Picotte</u> majority failed to grapple with the core holding of <u>Rogers</u>—that retroactive application of a change in the common law violates due process "only where it is unexpected and indefensible by reference" to prior law. 532 U.S. at 462 (quotation omitted). The <u>Picotte</u> court identified various policies favoring prospective abrogation, including reliance interests, stability in the law, efficient administration of justice, and institutional adherence to the rule of law. <u>Id</u>. ¶ 45. But as one dissenting Justice put it, the majority there failed to either "distinguish <u>Rogers</u>" or "provide a valid reason for straying from Supreme Court precedent." <u>Id</u>. ¶ 72 (Wilcox, J., concurring in part and dissenting in part). If, as the <u>Rogers</u> Court held, "retroactive abrogation of the year-and-a-day rule does not offend due process, then it is not unfair to retroactively abrogate the rule in this case." <u>Id</u>. ¶ 93 (Sykes, J., concurring in part and dissenting in part).

---

[C]lauses."); <u>Stevenson</u>, 331 N.W.2d at 148 ("Increasing the authorized penalty after the fact does not deny the defendant fair notice of what conduct is criminal, yet it still violates the rule against ex post facto criminal laws."); <u>Pine</u>, 524 A.2d at 1108 ("[T]he [D]ue-[P]rocess [C]lause prevents the accomplishment by judicial construction of that which is not permitted by statute."); <u>Jackson</u>, 528 A.2d at 1224 ("[W]e agree with those courts which have held that application of a decision abrogating the year and a day rule would violate the [E]x [P]ost [F]acto [C]lause and be fundamentally unfair."); <u>State v. Gabehart</u>, 1992 NMCA 074, ¶ 13, 836 P.2d 102 (adopting the reasoning of those courts that "have reasoned that applying such a decision retroactively would violate the constitutional prohibition against ex post facto laws or court decisions"); <u>Vance</u>, 403 S.E.2d at 500 ("We conclude that the prohibitions against ex post facto laws embodied in the [F]ifth and [F]ourteenth [A]mendments to the Constitution of the United States require that we give this decision abolishing the year and a day rule prospective effect only.").

¶ 41. We are also unpersuaded by Justice Scalia's dissenting opinion in Rogers, which invoked the principle of "nulla poena sine lege"—no punishment without law. 532 U.S. at 467 (Scalia, J., dissenting). Justice Scalia cited to Bouie v. City of Columbia, 378 U.S. 347 (1964), which he argued rests on this "fundamental principle." Rogers, 532 U.S. at 470 (Scalia, J., dissenting) (quotation omitted). But Bouie is in fact "rooted firmly in well established notions of due process" including "concepts of notice, foreseeability, and, in particular, the right to fair warning." Id. at 459. As Justice O'Connor wrote for the majority in Rogers, "[d]ue process clearly did not prohibit this process of judicial evolution at the time of the framing, and it does not do so today." Id. at 462. While "fundamental due process prohibits the punishment of conduct that cannot fairly be said to have been criminal at the time the conduct occurred, nothing suggests that is what took place here." Id. at 466 (citations omitted).

¶ 42. Our dissenting colleagues argue that allowing the prosecution to move forward is unjust because "the State already had a chance to prosecute defendant for attempted murder but chose not to." Post, ¶ 73. But the State's decision not to prosecute for attempted murder has no legal impact on whether it should be permitted to prosecute the distinct crime of second-degree murder. Failing to charge for attempted murder, but later bringing second-degree murder charges following the victim's death, is acceptable given the different intent requirements for the two crimes and the discretion of the prosecutor. As we have explained, attempted murder requires the State to prove that the accused "had a specific intent to kill rather than merely an intent to the do the act." State v. Haskins, 2016 VT 79, ¶ 37, 202 Vt. 461, 150 A.3d 202 (quotation omitted), cert. denied, 580 U.S. 1218 (2017). By contrast, second-degree murder can be proven with varying levels of intent, including "actual intent to kill, intent to do serious bodily injury, or extreme indifference to human life." State v. Blish, 172 Vt. 265, 272, 776 A.2d 380, 386 (2001).

¶ 43. The dissent also suggests that our decision could lead to unjust results in future cases, such as homicide prosecutions where many decades pass between the time of injury and death. Post, ¶ 76. This appears to be an argument not against retroactivity, but against abrogation

19

of the year-and-a-day rule altogether. We note only that the fundamental protection for criminal defendants in such cases is the requirement that the State prove all the elements of the crime, including causation, beyond a reasonable doubt. Whether the State has met this burden is a jury question to be determined within the facts of a given case. We stress that defendant here has not yet been tried, that he is entitled to all of his rights throughout the ensuing prosecution, and that the State must still meet its burden of proof.

¶ 44.  Finally, we note that our conclusion that the year-and-a-day rule was part of the substantive common-law definition of murder does not compel us to apply purely prospective abrogation. As numerous other state courts have determined, retroactivity hinges not on the precise label given to the rule, but on concepts of fairness rooted in due process. See Stevenson, 331 N.W.2d at 148 ("The key is the importance of the rights concerned and their effect on the defendant, not whether those rights can be characterized as 'merely' evidentiary or procedural."); Pine, 524 A.2d at 1108 ("We reject those decisions that turn on whether the rule is 'substantive,' 'evidentiary,' or 'procedural.' "); Lewis, 409 N.E.2d at 775 ("[C]haracterization of the rule as 'evidential' or 'substantive' does not strike us as the key here."). The fact that we have labeled the rule as a substantive principle does not require purely prospective abrogation where it is in fact "a principle in name only, having never once been enforced" in this state. Rogers, 532 U.S. at 466.

¶ 45.  Because retroactive abrogation of the rule would not be unexpected or indefensible by reference to prior law, id. at 462, and because our precedents strongly favor the retroactive application of changes in the common law, we hold that our abrogation of the year-and-a-day rule will apply to defendant.

## II.  Defendant's Alternative Arguments

¶ 46.  Because the above discussion reverses the dismissal of the charges against defendant, we must now consider defendant's alternative arguments for affirming. Defendant makes three arguments: (1) that the State failed to carry its burden of proof for its prima facie case;

(2) that prosecution is barred by double jeopardy; and (3) that prosecution is barred by his 2002 plea agreement.

¶ 47. As an initial matter, we reject the State's contention that defendant has waived his alternative arguments because he failed to cross-appeal the court's order. The State points to various alleged procedural deficiencies that result from the failure to cross-appeal, including an incomplete docketing statement, insufficient transcript orders, and limitations on the length of the appellate briefs.[10] But as we have repeatedly held, parties are not required to cross-appeal in order to raise alternative arguments where they are "content with the final order in the case." Staruski v. Cont'l Tel. Co. of Vt., 154 Vt. 568, 571 n.3, 581 A.2d 266, 267 n.3 (1990). Defendant was content with the final order here—dismissal in his favor. The recognized exceptions to this general rule do not apply because defendant does not seek to challenge any aspect of the final order, see Huddleston v. Univ. of Vt., 168 Vt. 249, 255-56, 719 A.2d 415, 419-20 (1998), and because his alternative arguments would result in the same procedural outcome as the court's order, see Perry v. Vt. Med. Prac. Bd., 169 Vt. 399, 402-03, 737 A.2d 900, 903 (1999). The State's arguments are thus contrary to our established precedents, and we consequently reject them. See, e.g., Valley Realty & Dev., Inc. v. Town of Hartford, 165 Vt. 463, 465 n.2, 685 A.2d 292, 294 n.2 (1996) ("A cross-appeal is unnecessary where the appellee is content with the final order in the case but raises alternative grounds to support it." (quotation omitted)); Coll v. Johnson, 161 Vt. 163, 167, 636 A.2d 336, 339 (1993) (allowing alternative argument without cross-appeal because "this is not a case where both parties are appealing the judgment below"); Larkin v. City of Burlington, 172 Vt. 566, 567, 772 A.2d 553, 556 (2001) (mem.) ("[T]he City had no obligation to file a cross-appeal because it was content with the superior court's final order."); see also 4 C.J.S. Appeal & Error

---

[10] We note that while the State is correct that a cross appeal permits the appellant to file a reply brief with 6000 words instead of 4500, V.R.A.P. 32(a)(4)(B), the State here was permitted on motion to file a 7000-word reply brief.

§ 21 (Mar. 2024) ("Cross appeals are properly limited to grievances a party has with the judgment as it was entered, not grievances it might acquire depending on the outcome of the appeal.").

¶ 48. Next, we decline to address defendant's prima-facie-case argument because the parties agreed to postpone the issue until after resolution of this appeal. At a hearing on October 31, 2022, the court suggested "deciding the legal questions" related to the year-and-a-day rule, double jeopardy, and the plea agreement, "letting one of [the parties] take an . . . interlocutory appeal to the Supreme Court, and then deal[ing] with the 12(d) if and when the Supreme Court returns the case." After a brief discussion, counsel for defendant agreed to this proposal, stating, "I think we could get a decision from you on three legal issues, and then at our leisure set a 12(d)" evidentiary hearing. Because the trial court delayed a decision on this issue, it did not have an opportunity to rule on it. See In re White, 172 Vt. 335, 343, 779 A.2d 1264, 1270 (2001) (requiring for preservation of issue for appeal that the trial court have a "fair opportunity to rule on it" (quotation omitted)). And because the trial court has not yet held an evidentiary hearing on the matter, the factual record is insufficiently developed for us to decide the issue. See Golden v. Worthington, 2020 VT 71, ¶ 8, 213 Vt. 77, 239 A.3d 259 ("If the record is inadequate for proper review of the claims on appeal, we will not consider them."); Longariello v. Windham Southwest Supervisory Union, 165 Vt. 573, 575, 679 A.2d 337, 339 (1996) (mem.) ("This argument was not considered by the superior court, and the record is inadequate to allow us to rule on it here."). We therefore decline to address this issue at this time. On remand, the court can hold further proceedings to address this issue.

## A. Double Jeopardy

¶ 49. We turn next to defendant's argument that this prosecution is barred by double jeopardy. The Double Jeopardy Clause of the U.S. Constitution, applicable to the states through the Due Process Clause of the Fourteenth Amendment, states that no person may "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. We have said that "[t]he guarantee against double jeopardy prevents a second or subsequent prosecution for the

same offense after either conviction or acquittal, as well as the imposition of multiple punishments for the same offense." State v. Grega, 168 Vt. 363, 382, 721 A.2d 445, 458 (1998). However, under the U.S. Supreme Court's test set forth in Blockburger v. United States, 284 U.S. 299 (1932), "the Double Jeopardy Clause does not prevent the State from trying a defendant in a single trial for two statutory offenses arising from the same event, so long as each provision requires proof of a fact which the other does not." State v. Stevens, 2003 VT 15, ¶ 7, 175 Vt. 503, 825 A.2d 8 (mem.).

¶ 50. While we have not previously addressed the intersection of the two crimes charged here, we conclude that each requires proof of a fact that the other does not. Defendant initially pleaded to a violation of 13 V.S.A. § 1043(a)(1), which provides that "[a] person commits the crime of first degree aggravated domestic assault if the person . . . attempts to cause or willfully or recklessly causes serious bodily injury to a family or household member." Defendant is now being charged with second-degree murder, in violation of 13 V.S.A. § 2301. The statute defines second-degree murder only as "[a]ll other kinds of murder" not specified to be first-degree murder. Id. "Thus, the Legislature has left it to this Court to flesh out the elements of second-degree murder," State v. Bourgoin, 2021 VT 15, ¶ 7, 214 Vt. 483, 254 A.3d 217 (quotation omitted), which we have defined as "the unlawful killing of another person with an intention to kill, an intention to do great bodily harm, or a wanton disregard of the likelihood that one's behavior may naturally cause death or great bodily harm," State v. King, 2006 VT 18, ¶ 16, 179 Vt. 400, 897 A.2d 543 (quotation omitted). The different elements for each crime are clear from the definitions: aggravated domestic assault requires proof that the defendant caused serious bodily injury "to a family or household member," 13 V.S.A. § 1043(a)(1), while second-degree murder requires the "unlawful killing of another person," not serious bodily injury, id. § 2301.

¶ 51. Defendant argues that while the statutes on their face require proof of different elements, we must look not solely to the statutes, but to the crimes as charged. We wrote in State v. Nelson that "even if, on the face of the statute, each of the[] two crimes involves an element that

23

the other does not, we will not permit both convictions if, as specifically charged, the charges require proof of the same facts." 2020 VT 94, ¶ 20, 213 Vt. 368, 246 A.3d 937 (quotation omitted) (alteration in original). Further, the Blockburger test "creates only a rebuttable presumption of legislative intent to authorize cumulative punishment that may be overcome by a clear indication of a contrary legislative intent." Id. ¶ 21 (quotation omitted). However, defendant points to no evidence of such contrary intent, and nothing in the text of either statute indicates a choice to rebut the Blockburger presumption. Moreover, looking to the crimes as charged, there is no doubt that the State is required to prove different facts for the two crimes. While defendant argues that as charged, "the second-degree murder charge specifically alleges that [defendant] caused the death of 'M.S.,' who is identified as his 'biological' daughter," the State is not required to prove this fact to secure a conviction. This is easily distinguished from Nelson, where we concluded that despite the distinct elements in the statutes, proving those elements for the two charged crimes required proof of "the same factual allegation" that defendant held a position of authority over the victim. Id. ¶ 38.

¶ 52. Even if the Blockburger test was not satisfied here, the U.S. Supreme Court has articulated an exception to the Double Jeopardy Clause for situations like this one where "the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred." Brown v. Ohio, 432 U.S. 161, 169 n.7 (1977); see Diaz v. United States, 223 U.S. 442, 449 (1912) ("At the time of the trial for [assault and battery] the death had not ensued, and not until it did ensue was the homicide committed. Then, and not before, was it possible to put the accused in jeopardy for that offense."); Ashe v. Swenson, 397 U.S. 436, 453 n.7 (1970) (Brennan, J., concurring) ("[W]here a crime is not completed or not discovered, despite diligence on the part of the police, until after the commencement of a prosecution for other crimes arising from the same transaction, an exception to the 'same transaction' rule should be made to permit a separate prosecution.").

24

¶ 53.    Thus, numerous other state courts have held that double jeopardy does not prohibit a murder charge subsequent to an earlier assault charge where the victim did not die until a later date.  See, e.g., People v. Latham, 631 N.E.2d 83, 85-86 (N.Y. 1994) ("In the case of delayed death . . . Blockburger does not bar a second prosecution for homicide following conviction of assault or another nonhomicide offense because the consummating element of death distinguishes the two offenses, and is not known . . . or discoverable . . . at the time of the first prosecution."); State v. Thomas, 294 A.2d 57, 60 (N.J. 1972) ("The law is settled that where the chronology of events is (1) assault and battery, (2) conviction of that offense, (3) death of the victim, and (4) indictment for homicide, the defense of double jeopardy is not available."); State v. Dye, 2010 Ohio 5728, ¶ 20 n.2, 939 N.E.2d 1217 ("When the victim dies after the defendant has pleaded guilty to an offense less serious than homicide, that plea does not itself bar the state from prosecuting the defendant for the homicide under double jeopardy principles.").  Accordingly, we conclude that defendant's murder prosecution is not barred by the Double Jeopardy Clause.

### B.  The Plea Agreement

¶ 54.    Defendant's final contention is that his 2002 plea agreement should bar this prosecution.  Defendant pleaded nolo contendere to one count of aggravated domestic assault, with a recommended sentence between forty-six months and fifteen years, ultimately serving nearly eleven years in prison.  The plea agreement was reduced to a single page on a pre-printed form containing only the disclaimer that the "State will not bring any further charges that are on file at this time."

¶ 55.    We have explained that "[t]he basic test of interpretation of a plea agreement is what the parties reasonably understood the agreement to be."  In re Meunier, 145 Vt. 414, 420, 491 A.2d 1019, 1024 (1985).  Plea agreements are contractual in nature and are therefore "subject to contract law standards."  State v. Earle, 145 Vt. 650, 652, 497 A.2d 28, 29 (1985).  Where "the language of a contract is clear, it shall be interpreted as written."  State v. George, 2022 VT 21, ¶ 16, 216 Vt. 353, 279 A.3d 135.  However, where "the agreement is ambiguous, it must be strictly

25

construed against its drafter, the State." Id.; see also State v. Byrne, 149 Vt. 224, 225, 542 A.2d 276, 277 (1988) (explaining that because criminal defendants surrender "significant rights upon entering a guilty plea," the State "must be held strictly to the terms of plea agreements").

¶ 56.    We conclude that the express terms of the plea agreement are unambiguous and do not prohibit this prosecution. The operative language in the agreement is the statement that the "State will not bring any further charges that are on file at this time." Defendant signed the plea agreement on November 4, 2002, and the victim did not die until 2016. The murder charge therefore could not have been "on file" at the time of the plea agreement because the victim had not yet died. Because plea agreements are contracts, subject to traditional contract law principles, we must apply the maxim that "[t]he law presumes the writing to contain the whole agreement." Economou v. Vt. Elec. Coop., Inc., 131 Vt. 636, 638, 313 A.2d 1, 3 (1973); see also United States v. Anderson, 921 F.2d 335, 338 (1st Cir. 1990) ("Under traditional contract principles, we should take an opposite tack, treating a plea agreement as a fully integrated contract and enforcing it according to its tenor, unfestooned with covenants the parties did not see fit to mention."). Here, there is no evidence that the parties ever contemplated the possibility of the victim later dying from her injuries. Absent any such evidence, we will not find by implication that the plea agreement prohibits not only those charges already "on file," but also any future charges relating to the same incident that were neither on file, nor chargeable at the time of the agreement.

¶ 57.    Nevertheless, as defendant identifies, several state courts have addressed similar claims and held that a defendant's plea agreement to a lesser charge barred a subsequent prosecution for murder when the victim later died, even where the agreement made no mention of that scenario. In State v. King, the Oregon Supreme Court held that:

> [I]n the absence of a statutory rule specifically addressing the issue, a contractual default rule or "gap-filler" is required when (1) the victim's death is reasonably foreseeable to the prosecutor and (2) the plea agreement does not address the subject of reprosecution in the event of the victim's death and arose from negotiations that also did not address that subject.

26

398 P.3d 336, 342-43 (Or. 2017). Similarly, in State v. Nelson, the Connecticut Appellate Court held that a plea agreement barred reprosecution for murder following an earlier plea to a lesser charge because "it was incumbent upon the state to enunciate what was and was not covered by the agreement lest the defendant be allowed to go to plea under the impression that the criminal portion of this tragic episode was closed." 579 A.2d 1104, 1106 (Conn. Ct. App. 1990), cert. denied, 582 A.2d 205 (Conn. 1990), cert. denied, 499 U.S. 922 (1991). Several other courts have reached the same result. See State v. Carpenter, 623 N.E.2d 66, 68 (Ohio 1993) ("[I]f the state wanted to reserve its right to bring further charges later, should the victim die, the state should have made such a reservation a part of the record."), cert. denied, 513 U.S. 1236 (1994); Thomas, 294 A.2d at 62 ("[I]n pressing the presently pending murder charge, the State is doing violence to its agreement, and is seeking to deprive the defendant of something for which he legitimately bargained."); Martin v. State, No. 658, 2020 WL 5423938, at *5 (Md. Ct. Spec. App. Sept. 10, 2020) (unpub. op.) ("Under the particular circumstances of this case . . . it was incumbent on the court to advise appellant explicitly that should the child die of [his] 2008 injuries, appellant could in the future be prosecuted for murder, child abuse resulting in death, or manslaughter."). Thus, as the Oregon Supreme Court made explicit in King, these courts effectively "applied a default contractual term to the plea agreement," 398 P.3d at 338, requiring the State to reserve the right to reprosecute, or else assume the risk that the victim might later die.

¶ 58. We are skeptical that such a default contract term should be implied absent any indication that the parties contemplated the term. As we have repeatedly held, plea agreements are contractual in nature and are subject to contract-law standards. State v. Careau, 2016 VT 18, ¶ 11, 201 Vt. 322, 141 A.3d 740; State v. Johnstone, 2013 VT 57, ¶ 11, 194 Vt. 230, 75 A.3d 642; Earle, 145 Vt. at 652, 497 A.2d at 29. Under contract law, "[i]n the absence of fraud, negligence or bad faith, alleged and established, it is not the duty of the court to read into contracts conditions or limitations which the parties have not assumed." Johnson v. Hardware Mut. Cas. Co., 108 Vt. 269, 281-82 187, A. 788, 794 (1936); see also Sanders v. St. Paul Mercury Ins. Co, 148 Vt. 496,

27

501, 536 A.2d 914, 917 (1987) ("[T]he Court will not read terms into a contract, unless they arise by necessary implication." (quotation omitted)); Medlar v. Aetna Ins. Co., 127 Vt. 337, 347, 248 A.2d 740, 747 (1968) ("Courts can only enforce agreements as written and are without authority to rewrite contracts . . . . It is the duty of the court to construe contracts, not make them for the parties."). The language of the agreement here makes no mention of the eventuality of the victim's death. But by its express terms, it does not forbid reprosecution under such circumstances. Under traditional contract principles, then, we would not read in a default contractual term forbidding reprosecution absent some showing of bad faith by the State. See Johnstone, 2013 VT 57, ¶ 11 ("The parties are entitled to rely upon the express terms of the agreement."); George, 2022 VT 21, ¶ 21 (relying on express terms of plea agreement because "there is no ambiguity to construe in defendant's favor"); United States v. Fentress, 792 F.2d 461, 464-65 (4th Cir. 1986) ("While the government must be held to the promises it made, it will not be bound to those it did not make. To do otherwise is to strip the bargaining process itself of meaning and content.").

¶ 59. Even if such a term could be presumed under certain circumstances, we conclude that the facts here are distinguishable from the cited cases in that there is no evidence of a reasonable expectation on the part of the parties—either the State or defendant—that the victim's death was likely or imminent. Defendant points to a statement by the State's Attorney during a May 2001 hearing that "[t]he child is lucky to be alive today" and that "she may never recover from" her injuries. But these statements suggest only that the injuries were serious and debilitating, not that the parties believed she was likely to succumb to the injuries. The record also reflects that in the days immediately after the injury, it was considered "life threatening and the prognosis for her survival was not known." But the record does not demonstrate that such concerns remained pressing at the time of the plea agreement. Indeed, during the change-of-plea hearing, no mention was made of the victim's condition, and neither party suggested that she might later die from her injuries.

28

¶ 60. This is in contrast to the cited cases, most of which included an explicit finding that the State knew of the likelihood of the victim's death. See <u>King</u>, 398 P.3d at 345 ("[T]he trial court determined, and the records reflects, that it was reasonably foreseeable to the state that the victim would die from his injuries during the assault." (emphasis omitted)); <u>Carpenter</u>, 623 N.E.2d at 68 ("[T]he state had actual knowledge of the alleged victim's condition at the time of the plea agreement and knew death was possible."); <u>Nelson</u>, 579 A.2d at 1106 ("The trial court found that the parties were aware of the victim's precarious condition."); <u>Martin</u>, 2020 WL 5423938, at *6 ("It was clear to all at the time of the plea that [the victim's] medical condition was extremely dire and grim and that he had little chance of surviving."); see also <u>Byrne</u>, 149 Vt. at 226, 542 A.2d at 277 (noting that content of plea agreement "is a question of fact to be resolved by the [trial] court" (quotation omitted)). Additionally, the fact that the victim here lived for an additional fourteen years after the plea suggests that her death was not immediately knowable. In contrast, in most of the cited cases, the victim ultimately died shortly after the defendant's plea. See <u>King</u>, 398 P.3d at 340-41 (six months); <u>Nelson</u>, 579 A.2d at 1105 (six months); <u>Thomas</u>, 294 A.2d at 58-59 (three months); <u>Carpenter</u>, 623 N.E.2d at 67 (syllabus) (fourteen months). While the death of the victim only a few months after the plea agreement might suggest that the State knew or should have known about the victim's condition, the fourteen-year gap here suggests not some willful omission or negligence, but rather that the parties did not anticipate the victim's death from her injuries.

¶ 61. There is also no evidence here that defendant actually believed the plea agreement would forbid future prosecution in the event that the victim later died. Defendant does not suggest that he was advised that the plea agreement would bar such prosecution. See <u>Thomas</u>, 294 A.2d at 60 (noting that the defendant was "advised by counsel that if he had committed the crime it would be to his advantage to plead guilty . . . as this would probably preclude a later prosecution for murder"); <u>Carpenter</u>, 623 N.E.2d at 68 ("[T]he appellant anticipated that by pleading guilty to attempted felonious assault, and giving up rights which may have resulted in his acquittal, he was terminating the incident and could not be called on to account further on any charges regarding

29

this incident."). And he did not mention such a belief during his change of plea hearing, but instead agreed that no promises had been made beyond those discussed at the hearing. Nor does defendant's subsequent behavior suggests that he subjectively held this view. To the contrary, when defendant was contacted by police following the victim's death, he did not assert a belief that the plea agreement had already resolved his culpability, but instead continued to insist on his innocence, raising for the first time a contention that the assault was actually committed by a boarder who was living with him at the time. Defendant continued to make this assertion during two further calls with police over the next several months.

¶ 62. On appeal, defendant asserts only that we should assume he held these beliefs because otherwise, "his decision to accept a plea deal requiring him to serve up to 15 years in prison would be 'illogical.' " But to the extent defendant did in fact hold such a belief, it was not reasonable based on the terms of the agreement or the content of the negotiations. See Meunier, 145 Vt. at 420, 491 A.2d at 1024 (stating that test for interpreting plea agreements is "what the parties reasonably understood the agreement to be"). As discussed, the plain language of the plea agreement only prevents the State from bringing those charges that were "on file" at that time. The murder charge was not, and could not have been, on file at the time of the plea agreement. Nothing in the terms of the agreement gives rise to a contrary interpretation. The charge defendant pleaded to is not a lesser-included offense of second-degree murder. See Carpenter, 623 N.E.2d at 68 (emphasizing that defendant pleaded "to a lesser included charge"). The State did not have any attempted murder charges on file, the dismissal of which might have supported a belief that the plea agreement would also prevent future murder charges. And the plea agreement set out only a range of possible sentences, not a specific term of imprisonment. See Nelson, 579 A.2d at 1107 ("[W]e think it significant that the parties agreed to a specific term of imprisonment.").

¶ 63. Defendant also does not suggest that negotiations with the State created a contrary understanding of the meaning of this language. At his change-of-plea and sentencing hearing, defendant was asked whether he had been given any promises "other than what's in the plea

30

agreement and the particular things we talked about right here in court," and he responded, "No." To the extent that he believed that the agreement barred his future prosecution for murder, defendant does not point to any evidence that the State knew of his subjective understanding of the terms. See Carpenter, 623 N.E.2d at 68 ("We think . . that the prosecutor was aware of this expectation."); Thomas, 294 A.2d at 62 (concluding that defendant's belief that "he was terminating the incident and could not thereafter be called upon to account further . . . was shared by the prosecutor"). Finally, he does not present any evidence that the State itself held such a belief. See Nelson, 579 A.2d at 1106 (noting that the state "moved to have certain evidence in the case destroyed" following the sentencing, "consistent with a belief that no further charges will be brought"). Absent any evidence of a contrary understanding, we cannot conclude that the parties reasonably understood the agreement to mean something other than its plain meaning. Accordingly, we conclude that defendant's plea agreement does not bar this prosecution.

### III. Conclusion

¶ 64. The common-law year-and-a-day rule is hereby abrogated. In accordance with the common-law rule on retroactivity, the abrogation is applicable both prospectively and retroactively to defendant in this case. We also conclude that the prosecution is not barred by either the Double Jeopardy Clause or by defendant's plea agreement. We therefore reverse the trial court's grant of the motion to dismiss and remand for further proceedings.

Reversed and remanded.

FOR THE COURT:

_____

Chief Justice

¶ 65. **EATON, J, dissenting.** I agree with the majority's decision to abrogate the year-and-a-day rule. It is fundamentally unfair, however, to apply that abrogation to this defendant and permit the State to prosecute him for murder. Choosing instead to abrogate the year-and-a-day rule on a purely prospective basis would be appropriate, fair, and entirely consistent with the full

31

scope of federal law on this matter. Unlike cases where changes in the law benefit defendants, applying our abrogation of the rule to this defendant exposes him to additional punishment even though his actions giving rise to M.S.'s death did not constitute murder under Vermont law at the time she died. Further, the State has already prosecuted and punished defendant for the severe injuries he inflicted on M.S. over twenty years ago. For these reasons, I respectfully dissent.

I. Prospective Abrogation

¶ 66.    The only fair, just, and appropriate resolution in this case is to abrogate the year-and-a-day rule purely prospectively without applying the change in the law to this defendant. This result is grounded in this Court's recognition that changes in the law may be applied purely prospectively in some instances. In State v. Shattuck, 141 Vt. 523, 450 A.2d 1122 (1982), we "adopted the common law rule that a change in [our] law will be given effect to pending cases on direct review," In re Stevens, 146 Vt. 6, 10, 497 A.2d 744, 750 (1985) (citing Shattuck, 141 Vt. at 529, 450 A.2d at 1125), and to parties in the case announcing the new rule, Shattuck, 141 Vt. at 529, 450 A.2d at 1125. As such, we follow the general rule that changes in the law are given retroactive effect.[11]   However, Shattuck also recognized that some changes ought to apply purely prospectively or, in other words, only to cases whose operative facts arise after the change in the law and not in the case where the change is announced. 141 Vt. at 529-30, 450 A.2d at 1125. We thus apply "prospectivity . . . [a]s an exception to the general rule that judicial decisions are applied retroactively." State v. Brown, 165 Vt. 79, 83, 676 A.2d 350, 353 (1996) (quotation omitted). This case falls within the exception recognized in Shattuck.

¶ 67.    Past cases employ retroactivity because changes in the law often benefit criminal defendants, such as decisions creating new procedural protections. See, e.g., State v. Piper, 143 Vt. 468, 471, 468 A.2d 554, 555 (1983) (finding "ample justification" to follow the general rule

---

[11]   I use "retroactive" to refer to the application of a change in the law to both the parties in the case announcing the new rule and to those in other cases on appeal, which aligns with how the majority defines and discusses retroactivity. Ante, ¶¶ 28-45.

32

of "retroactivity articulated in <u>Shattuck</u>" because that case "involve[d] an important constitutional question involving the rights of" defendants); <u>Brown</u>, 165 Vt. at 84, 676 A.2d at 353-54 (holding new rule on assistance of counsel applied retroactively because it was "fundamental element of due process"). But if a change produces inequitable results or risks instability in the law if applied to the party in that case, as here, the change may be applied purely prospectively. <u>Am. Trucking Ass'ns v. Conway</u>, 152 Vt. 363, 378, 566 A.2d 1323, 1332-33 (1989); <u>Deutsche Bank Nat'l Tr. Co. v. Watts</u>, 2017 VT 57, ¶ 13, 205 Vt. 56, 171 A.3d 392. This is such a case.

¶ 68. We do not stand alone in recognizing that a prospective change in our law is sometimes appropriate, as an exception to the general rule. See M. C. Hutton, <u>Retroactivity in the States: The Impact of Teague v. Lane on State Postconviction Remedies</u>, 44 Ala. L. Rev. 421, 476 (1993) (appendix) (listing Vermont as one of many states that recognize exception to retroactive application of new rules to cases on appeal and other pending cases). Other jurisdictions often favor retroactivity, as we do, when it benefits criminal defendants. See, e.g., <u>State v. Hinkle</u>, 489 S.E.2d 257, 264 n.27 (W. Va. 1996) (supporting retroactivity in criminal matter as means of "[a]ffording the defendant [a] benefit"); <u>Brown v. State</u>, 198 So. 3d 325, 331-32 (Miss. Ct. App. 2015) (en banc) (similar), <u>cert. denied</u>, 580 U.S. 1063 (2017). By contrast, other jurisdictions rely on prospectivity where, as here, it would be unfair or inequitable to apply a change in the law to the parties in the case, or where retroactivity would be injurious to stability in the law. See, e.g., <u>Butz v. World Wide Inc.</u>, 492 N.W.2d 88, 91 (N.D. 1992) (applying pure prospectivity and determining it would be "unduly burdensome and unfair" to apply its change in loss-of-consortium law retroactively); <u>Placek v. City of Sterling Heights</u>, 275 N.W.2d 511, 522 (Mich. 1979) (similar); <u>State ex rel. Wash. State Fin. Comm. v. Martin</u>, 384 P.2d 833, 849 (Wash. 1963) (similar); see also, e.g., T. E. Fairchild, <u>Limitation of New Judge-Made Law to Prospective Effect Only: "Prospective Overruling" or "Sunbursting,"</u> 51 Marq. L. Rev. 254, 254-55 (1968) (noting that courts often employ prospectivity where retroactivity would harm "society's interest in stability");

33

T. S. Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va. L. Rev. 201, 235-38, 254-55 (1965) (similar).

¶ 69.   Most notably, in State v. Picotte, the Wisconsin Supreme Court abrogated the year-and-a-day rule and determined it was appropriate to do so purely prospectively, based on fundamental fairness and the "equities" of the case.  2003 WI 42, ¶¶ 29, 44, 661 N.W.2d 381 (quotation omitted).  Like Vermont, Wisconsin "generally adheres to the [rule that] . . . a decision to overrule . . . an earlier decision is retrospective in operation" but also "recognize[s] exceptions" that allow for "prospective overruling."  Id. ¶¶ 42-43 (quotation omitted).  In justifying the appropriateness of purely prospective abrogation, Picotte cited two main reasons.  It first highlighted the fundamental unfairness of "making acts criminal that were not . . . criminal when they occurred" by abrogating the rule and allowing the state to charge the defendant.  Id. ¶¶ 47, 50, 52.  It then underscored the defendant's prior guilty plea, the years that had passed between the victim's injury and death, and the defendant's later incarceration for the same underlying act, which led the court to conclude that allowing the state to retroactively charge the defendant was unjust.  Id. ¶¶ 50-51, 53, 64.

¶ 70.   Here, like Picotte, the appropriate, just, and fundamentally fair resolution is purely prospective abrogation of the year-and-a-day rule.  Defendant undeniably committed a violent act against his infant daughter, and it was appropriate for him to be prosecuted and punished for that act.  However, it is neither appropriate, fair, nor equitable to allow prosecution for murder where his act was not murder when committed, the State prosecuted him for his actions, defendant pleaded guilty and was incarcerated, and a long time period separated defendant's action, the victim's death, and the State's attempted murder prosecution.  See Picotte, 2003 WI 42, ¶¶ 44-45, 45 n.53 (observing that prospectivity is "question of policy" requiring careful consideration of facts and rule in each case (quotation omitted) (citing R. Traynor, Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility, 28 Hastings L.J. 533, 541-42 (1977))).

¶ 71.     Unfairness primarily results from allowing the State to charge defendant based on a change in the substantive definition of murder that occurred after defendant's act, the conclusion of defendant's initial prosecution, and the victim's death.  As the majority concedes, the year-and-a-day rule was a "part of the substantive . . . definition of murder" that existed under "Vermont [common] law" since "the State's inception" more than two centuries ago.  Ante, ¶¶ 8-9.  Thus the year-and-a-day limitation on murder was the law in Vermont since at least 1791 and continued to be the law in 2001 when defendant assaulted M.S., in 2016 when M.S. died, and in 2022 when the State charged defendant with murder over six years after M.S.'s death.  The State's prosecution was barred, and it is only by abrogating the common-law rule that this prosecution can proceed.  On analogous grounds, the court in Picotte did not apply the abrogation to the defendant because it would have allowed prosecution for an act where no liability for murder had previously existed.  2003 WI 42, ¶¶ 50-51.

¶ 72.     Additionally, defendant already pleaded nolo contendere to assault, served eleven years in prison for his crime, and was released from confinement.  Even after M.S. died in 2016, the State waited an additional six years before charging defendant with murder in 2022.  Based on similar facts, the court in Picotte did not apply its abrogation of the year-and-a-day rule to that defendant where death occurred two years after the injury and the defendant had already "pled guilty to . . . battery and was sentenced to 15 years."  Id. ¶ 51.  The court "recognize[d] the hardships created by retroactive application," especially for defendants who had already been prosecuted and punished, and explained that "for the state to assure a man that he had become safe from its pursuit, and thereafter to withdraw its assurance," as the majority permits here, is inherently "unfair."  Id. ¶¶ 48, 52 (quoting Falter v. United States, 23 F.2d 420, 425-26 (2d Cir. 1928), cert. denied, 277 U.S. 590 (1928)).

¶ 73.     Moreover, application to defendant here is unjust because the State already had a chance to prosecute defendant for attempted murder but chose not to.  The State knew how severely injured M.S. was at the time of the initial charges against defendant, describing M.S. as "lucky to

35

be alive," and could have reflected this concern by charging defendant with attempted murder, which carries greater potential punishment than domestic assault and the same punishment as murder. See 13 V.S.A. § 9(a) ("A person who attempts to commit . . . murder . . . shall be punished as the offense attempted."). The State instead entered a plea bargain with the defendant, choosing not to charge him with attempted murder.[12] It is inherently unfair to allow the State a second chance to charge defendant and seek additional punishment for the same act, especially so long after the initial charges and when M.S.'s death was a very real possibility at the outset. See State v. Fonseca-Cintron, 2019 VT 80, ¶ 33, 213 Vt. 11, 238 A.3d 594 (Robinson, J., concurring in part and dissenting in part) (recognizing inherent unfairness in allowing "the State to seek punishment for the same act through creative charging strategies"); accord Falter, 23 F.2d at 425-26.

¶ 74. The facts of this case are also patently distinguishable from those where this Court has determined retroactivity was appropriate and fair. In Piper, this Court upheld the retroactive application of the "interested-adult" rule for minor criminal defendants because "[t]he purpose of the rule is to guard against improvident waivers resulting from the minor's lack of sophistication or experience" and thus protect criminal defendants. 143 Vt. at 473, 468 A.2d at 557. Likewise, in Brown, we retroactively applied a change in interpreting the Public Defenders Act and expressly justified doing so because it "maintain[ed] the integrity of the truth-finding process by ensuring that a defendant has every opportunity to present defenses." 165 Vt. at 84, 676 A.2d at 353. By

---

[12] At oral argument, the State claimed it may have been reluctant to charge defendant with attempted second-degree murder in 2001 because this Court had not yet determined whether that charge requires a specific intent mens rea under Vermont law. Whether or not this Court has so decided, it has apparently not hampered the State in the past. We have reviewed no fewer than thirty prosecutions involving attempted second-degree murder, some as recently as last year. See, e.g., State v. Young, 2023 VT 10, ¶ 3, __ Vt. __, 292 A.3d 689 ("He pleaded not guilty to charges including attempted second-degree murder."); State v. Vialet, 2021 VT 62, ¶ 2, 215 Vt. 648, 261 A.3d 642 (mem.) ("[D]efendant was arraigned on charges of attempted second-degree murder."). One of these cases, in which we affirmed the defendant's conviction, was issued less than two weeks after defendant's assault on M.S. See State v. Nguyen, 173 Vt. 598, 598, 795 A.2d 538, 539 (2002) (mem.).

contrast, the new rule of law created here—that murder under 13 V.S.A. § 2301 no longer requires the victim's death to occur within a year and a day of the injury the victim sustained—changes the law to defendant's detriment by allowing the State to charge him with murder. Ante ¶¶ 8, 45. The majority has thus employed a rule of retroactivity, traditionally applied in favor of criminal defendants, see Piper, 143 Vt. at 473, 468 A.2d at 557, to have the very opposite effect.

¶ 75. Beyond the facts of this case alone, applying our abrogation of the rule to defendant in this case risks a deleterious impact on our justice system. As the court in Picotte observed, applying purely prospective abrogation, where appropriate, bolsters public confidence in our criminal justice system. See Picotte, 2003 WI 42, ¶¶ 52, 56. Promoting such confidence, by supporting the importance of protections for the accused, has long been of deep concern to this Court. See, e.g., State v. Roberts, 154 Vt. 59, 66, 574 A.2d 1248, 1249 (1990) (recognizing important "types of protections for a criminal defendant"), abrogated in part by Crawford v. Washington, 541 U.S. 36 (2004); accord Picotte, 2003 WI 42, ¶ 50 ("[We] accord[] high value to the rule of law and institutional adherence to the law."). Applying the change in the law to defendant here risks the opposite outcome by exposing defendant to additional liability not possible at the time of his acts, which may threaten public confidence in our justice system and its safeguards for the accused. As the court in Picotte reasoned, an overbroad approach to retroactivity that does not account for the "equities" of each case "threatens . . . liberty interests," "undermines stability in the law . . . and paints [the] justice system with a brush of arbitrariness." Id. ¶¶ 44, 53-54, 56.

¶ 76. Future cases could present even more unjust, or potentially absurd, results. Under the majority's retroactive abrogation of the rule, there are few, if any, limits on how far back the State could reach to prosecute homicides even where vast spans of time separate a victim's injury and death. There is no statute of limitations on homicide prosecutions in Vermont. State v. Delisle, 162 Vt. 293, 312, 648 A.2d 632, 644 (1994) (citing 13 V.S.A. § 4501(a)). With retroactive application of the year-and-a-day rule, the State could prosecute individuals for murder even where

37

many decades separated a victim's injury, the victim's death, and the eventual prosecution. This would allow the State to bring belated and serious charges even against a defendant already prosecuted for other offenses based on the same conduct. This risk is not merely conjecture. For example, in New York (a state that has long lacked the year-and-a-day rule), police launched a murder investigation in 2015 concerning a ninety-seven-year-old man who had ostensibly died from a stab wound he sustained more than fifty-five years prior. J. D. Goodman, A Twist in the Murder of a 97-Year-Old Man: He Was Knifed 5 Decades Ago, N.Y. Times (Jan. 24, 2015), https://www.nytimes.com/2015/01/25/nyregion/a-twist-in-the-murder-of-a-97-year-old-man-he-was-knifed-5-decades-ago.html; see People v. Brengard, 191 N.E. 850, 852-53 (N.Y. 1934) (recognizing year-and-a-day rule does not exist in New York).

¶ 77. The majority applies the change in the law to defendant by overreading the relevance of the U.S. Supreme Court's decision in Rogers v. Tennessee, 532 U.S. 451, 453 (2001). It is settled law, per Rogers, that state courts can retroactively abrogate the year-and-a-day rule without violating federal due process rights, unless the abrogation is "unexpected and indefensible" based on the law that existed before the defendant's criminal act. Id. at 462 (quotation omitted). But Rogers does not compel a state court to abrogate the year-and-a-day rule retroactively or provide a reason to prefer retroactivity. See id. at 461. It merely indicates when a state court is prohibited on federal due process grounds from doing so. See Picotte, 2003 WI 42, ¶¶ 38-41 (relying on Rogers, 532 U.S. at 461, for proposition that state courts are free to choose either retroactivity or prospectivity absent due process concerns). I agree that retroactive abrogation does not violate defendant's due process rights in this case. Therefore, under Rogers, retroactivity is an issue of policy that must be decided based on Vermont law. See id. ¶ 41 ("Rogers . . . makes clear that state courts must decide for themselves whether to abrogate the . . . year-and-a-day rule prospectively or retroactively." (emphasis added)). By claiming that retroactivity is "[c]onsistent with . . . the . . . decision in Rogers" and finding "no reason to depart"

from retroactivity based on that case, the majority mistakenly views Rogers as dispositive in this case. Ante, ¶¶ 1, 28. It is not.[13]

¶ 78. The majority further justifies applying the general rule of retroactivity by presuming that, because this Court has "not applied a change in the common law on a purely prospective basis in any criminal case since Shattuck," the Shattuck exception, that some changes in the law should be applied only prospectively, ought to be ignored. Ante ¶ 29. It is well settled in other jurisdictions, however, that the fact a rule or exception has not been applied before is not grounds to ignore it. See Hana Fin., Inc. v. Hana Bank, 735 F.3d 1158, 1168 (9th Cir. 2013), aff'd, 574 U.S. 418 (2015) ("[T]he fact that [a] doctrine rarely applies does not mean that it never will."); Coleman v. State ex rel. Mitchell, 182 So. 627, 630 (Fla. 1938) (per curiam) ("[I]t is the duty of [a] court to apply . . . existing principles, even though the principle has not before been applied." (quotation omitted)); see also Furchtgott v. Young, 487 S.W.2d 301, 304 (Tenn. 1972) (reversing lower court because it "overlooked the exception to the general rules"); Cent. Power & Light Co. v. Sharp, 960 S.W.2d 617, 618 (Tex. 1997) (per curiam) (reversing lower court because it "ignored an exception to th[e] rule"); Geringer v. Bebout, 10 P.3d 514, 528 (Wyo. 2000) (Thomas, J., dissenting) (disapproving majority because it "ignored an exception"). Respectfully, there is no point in having an exception that is never used. If the facts here do not give rise to the exception to retroactivity we recognized in Shattuck, then I am hard pressed to understand—and the majority fails to indicate—what facts would.

---

[13] In discussing Rogers, the majority likewise claims it is "unpersuaded by Justice Scalia's dissenting opinion" and its "principle of nulla poena sine lege" ("no punishment without law"), which requires that there is a law in place before punishment can be imposed. Ante ¶ 41. While it is axiomatic that dissents are not the law and carry only persuasive weight, our own precedent makes the Rogers dissent deserving of more than cursory dismissal. This Court has expressly adopted the maxim "nulla poena sine lege" not as a matter of due process but as a matter of substantive criminal law in State v. Burpee. 65 Vt. 1, 32, 25 A. 964, 973 (1892). There, we described it as a "fundamental[]" and "important" maxim dictating that unless a "violation of law [is] preannounced . . . there is no crime[] and can be no punishment." Id.; see generally S. Dana, Beyond Retroactivity to Realizing Justice, 99 J. Crim. L. & Criminology 857 (2009) (describing history and application of nulla poena sine lege rule). The majority errs in ignoring this authority.

¶ 79. The majority attempts to distinguish the exception to retroactivity under Shattuck by reference to cases that are largely inapplicable. Many cases cited were decided before Shattuck, including State v. Peters, 141 Vt. 341, 450 A.2d 332 (1982) (decided two months before Shattuck), O'Brien v. Comstock Foods, Inc., 125 Vt. 158, 212 A.2d 69 (1965) (decided seventeen years before Shattuck), and Foster v. Roman Catholic Diocese of Vt., 116 Vt. 124, 70 A.2d 230 (1950) (decided thirty-two years before Shattuck). Ante, ¶ 30. The majority also emphasizes retroactivity in civil cases, including Demag v. Better Power Equipment, Inc., 2014 VT 78, 197 Vt. 176, 102 A.3d 1101, and Hilder v. St. Peter, 144 Vt. 150, 478 A.2d 202 (1984), ante, ¶ 30, where the issues of fundamental fairness, and thus the appropriateness of retroactivity, were far less pronounced than here. See State v. de Macedo Soares, 2011 VT 56, ¶ 6, 190 Vt. 549, 26 A.3d 37 (mem.) ("[B]eing a civil defendant is fundamentally different from being a criminal defendant." (quotation omitted)); accord Fitzpatrick v. Wendy's Old Fashioned Hamburgers of N.Y., Inc., 168 N.E.3d 361, 369 (Mass. 2021) (noting that, because "stakes in a criminal case are . . . higher, jail or freedom, compared with gain or loss of property in a civil case," criminal cases require stronger safeguards for defendants (quotation omitted)). The one case the majority claims is "illustrative of our . . . approach" and on which it bases much of its analysis, State v. Congress, 2014 VT 129, 198 Vt. 241, 114 A.3d 1128, does not cite Shattuck, let alone interpret its holding or its exception. Ante, ¶ 31. In fact, Congress makes no mention of "retroactivity" or "prospectivity."

¶ 80. Conversely, the majority disregards relevant precedent from other jurisdictions, most notably Wisconsin's decision in Picotte. See State v. Bonvie, 2007 VT 82, ¶ 6, 182 Vt. 216, 936 A.2d 1291 (noting that we "examine . . . other jurisdictions that have addressed [an] issue" if we lack prior authority "resolv[ing] the matter conclusively"). The majority attempts to cast Picotte as a largely flawed decision because it supposedly failed to sufficiently engage with Rogers. Ante, ¶ 40. Any perceived lack of a robust analysis of Rogers, however, does not invalidate Picotte's relevance in explaining when prospective abrogation of the year-and-a-day rule is just, fair, and appropriate. See Picotte, 2003 WI 42, ¶¶ 45-63. In Shattuck, this Court

40

expressly recognized that it may be "appropriate" to apply some changes prospectively, 141 Vt. at 429-30, 450 A.2d at 1125, and the Picotte decision exemplifies when the Shattuck exception rightly applies. See Brown, 165 Vt. at 83, 676 A.2d at 352-53 (recognizing existence of prospectivity exception in Shattuck).

¶ 81. By disregarding applicable precedent from other jurisdictions, especially Picotte, the majority underemphasizes the extent to which its decision is unmoored from how other jurisdictions have chosen to abrogate the year-and-a-day rule. Since Rogers in 2001, only two cases have decided whether to judicially abrogate the rule, Picotte and State v. Grant, 378 So. 3d 576 (Ala. 2022). The former held that the year-and-a-day rule was overruled purely prospectively, and the latter declined to hold either way. See Picotte, 2003 WI 42, ¶ 57 ("[W]e conclude that the year-and-a-day rule should be overruled purely prospectively."); cf. Grant, 378 So. 3d at 584 (Sellers, J., concurring) ("I do not read the [majority] opinion today as settling the issue whether the overruling . . . should be applied retroactively."). Conversely, only two cases have ever chosen to judicially abrogate the year-and-a-day rule and apply it in the case where the change was made, Commonwealth v. Ladd, 166 A.2d 501 (Pa. 1960), and State v. Rogers, 992 S.W.2d 398, 895 (Tenn. 1999). The former makes no reference to the issue of retroactivity versus prospectivity, and the latter resulted in the Supreme Court's 5-4 decision in Rogers. As a result, no court post-Rogers—until the decision the majority reached today—has chosen to abrogate the year-and-a-day rule retroactively.

II. Consistency of Prospective Abrogation with Federal Law

¶ 82. Abrogating the year-and-a-day rule purely prospectively is entirely consistent with the U.S. Supreme Court's recognition that state courts are free to apply changes in substantive state law prospectively. Federal law holds an important place in our case law on retroactivity because, as we explained following Shattuck, our rule on retroactivity "does not differ in any significant respect from the federal rule." In re Barber, 2018 VT 78, ¶ 7, 208 Vt. 77, 195 A.3d 364 (quoting State v. White, 2007 VT 113, ¶ 11, 182 Vt. 510, 944 A.2d 203). The Supreme Court, in

turn, has long held that federal law does not constrain state courts from prospectively changing substantive state law. In Great Northern Railway v. Sunburst Oil & Refining Co., the Court unanimously affirmed a Montana Supreme Court decision overruling a previous interpretation of state law on a purely prospective basis, holding that state courts are free to "make a choice for itself" to apply prospectivity and that federal law "has no voice upon the subject." 287 U.S. 358, 364 (1932). In Chicot County Drainage District v. Baxter State Bank, the Court further clarified its opposition to an absolute or universal approach to retroactivity. 308 U.S. 371, 374-75 (1940).

¶ 83. The Supreme Court later narrowed its view on prospectivity but reaffirmed state courts' power to apply changes in state law prospectively. Subsequent cases determined that new rules of constitutional criminal procedure and other matters under federal law apply retroactively on direct review. See Griffith v. Kentucky, 479 U.S. 314, 324-25 (1987) (applying new rule on peremptory challenges retroactively); see also Harper v. Va. Dep't of Tax'n, 509 U.S. 86, 100 (1993) (applying new rule on federal tax immunity retroactively); James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 542-43 (1991) (plurality opinion) (applying new rule under Commerce Clause retroactively). However, these same cases reaffirmed state courts' freedom to choose retroactive or prospective application to changes in substantive state law. See Harper, 509 U.S. at 100 (affirming "the freedom state courts enjoy . . . to limit the retroactive operation of their own interpretations of state law" (citing Sunburst Oil, 287 U.S. at 364-66)); see also Beam, 501 U.S. at 536 (recognizing that retroactivity is not question of federal law unless rule at issue itself derives from federal law). Even Rogers, on which the majority bases much of its analysis, ante, ¶¶ 1, 33-36, 38, frees state courts to make their own choice whether to apply changes prospectively. See Rogers, 532 U.S. at 461 (noting federal law "accords [state] courts . . . substantial leeway").

¶ 84. We have interpreted federal law consistent with our freedom to apply changes prospectively in substantive state law. In many cases, we recognized the limited nature of federal law on retroactivity, which extends only to constitutional rules and other matters under federal law. E.g., White, 2007 VT 113, ¶¶ 2 n.2, 12; Barber, 2018 VT 78, ¶ 7 (similar). Conversely, we

indicated that if, like here, a decision is not "based on the federal constitution or other federal law," then "we [are] not required to follow" federal cases on retroactivity. Deutsche Bank Nat'l Tr. Co., 2017 VT 57, ¶ 18. Consequently, federal law does not "impede [our] discretion to postpone [the] operative date of [a] ruling where exigencies require." Baker v. State, 170 Vt. 194, 226, 744 A.2d 864, 887 (1999).

¶ 85. Here, it is well within this Court's power to prospectively abrogate the year-and-a-day rule without offending federal law. As the majority concedes, the year-and-a-day rule was a "substantive . . . part of Vermont law." Ante, ¶¶ 8-9. Accordingly, a decision to abrogate the year-and-a-day rule—a rule of substantive state law—on a purely prospective basis is entirely consistent with federal cases and our interpretation of those cases. See Harper, 509 U.S. at 100 (citing Sunburst Oil, 287 U.S. at 364); Beam, 501 U.S. at 536); see also Rogers, 532 U.S. at 461. Indeed, federal law does not compel this Court to retroactively apply changes in state law or preclude this Court from applying the change purely prospectively. See Deutsche Bank Nat'l Tr. Co., 2017 VT 57, ¶¶ 17-18, 20; see also Baker, 170 Vt. at 226, 744 A.2d at 887.

¶ 86. The majority misinterprets the full scope of federal Supreme Court precedent on this matter. It wholly disregards Sunburst Oil, Chicot, and the later cases that adhered to the general rule the Court recognized. Instead, it pulls language from Harper and Beam that calls for retroactive application on matters of federal law, ante, ¶ 37, and neglects the general rule, reaffirmed in both Harper and Beam, that state courts can choose prospective application on matters of state law, as is the case here. See Harper, 509 U.S. at 100; Beam, 501 U.S. at 54. Thus, the majority reads Harper and Beam out of context. When the Court in Harper spoke about the law "shift[ing] and spring[ing] according to the particular equities" of cases, it raised its concern regarding courts' interpretations of federal law, not a state court's interpretations of its own laws. 509 U.S. at 97.

¶ 87. The majority is misguided in its fear that prospectivity "risks arbitrariness" and "open[s] the door to case-by-case decisions." Ante, ¶ 37. This Court in Shattuck took no concern

43

with any risk of arbitrariness when it recognized the need for, and adopted an exception to, the general rule of retroactivity. See 141 Vt. at 528-29, 450 A.2d at 1124-25. Nor has the Supreme Court in cases like Harper and Beam taken concern with a risk of arbitrariness when it recognized the state courts' freedom to choose prospective or retroactive application for changes in state law. See Harper, 509 U.S. at 100 (citing Sunburst Oil, 287 U.S. at 364); Beam, 501 U.S. at 536 (citing Chicot, 308 U.S. at 374)). It is not arbitrary to recognize that few rules, including the general rule of retroactivity, are without exceptions. See Roberts v. Univ. of Vt., 2013 VT 30, ¶ 23, 193 Vt. 529, 70 A.3d 1058 ("Rules . . . are rarely, if ever, without anomalies." (quotation omitted)); accord Okpalobi v. Foster, 244 F.3d 405, 411 (5th Cir. 2001) ("[F]ew rules are without exceptions."); United States v. Brown, 481 F.2d 1035, 1040 (8th Cir. 1973) ("[M]ost [rules are] not without important exceptions.").

¶ 88.    The majority's hard-line approach in favor of retroactivity is contrary to Supreme Court precedent and trends in other jurisdictions. Historically, the Supreme Court recognized no instance where a change in the law should apply only prospectively. Kuhn v. Fairmont Coal Co., 215 U.S. 349, 372 (1910) (Holmes, J., dissenting) ("I know of no authority . . . to say that . . . state decisions shall make law only for the future. Judicial decisions have . . . retrospective operation."). Later, however, the Court expressly abandoned this approach. Sunburst Oil, 287 U.S. at 364; Chicot, 308 U.S. at 374; see Linkletter v. Walker, 381 U.S. 618, 629 (1965) ("[Courts] are n[ot] required to apply . . . a decision retrospectively."). The states followed suit, and no jurisdiction today still adheres to an absolute rule of retroactivity without exception. See Hutton, supra, 460-76 (appendix) (collecting exceptions by jurisdiction); see also A. Haddad, Cruel Timing: Retroactive Application of State Criminal Procedural Rules to Direct Appeals, 116 Colum. L. Rev. 1259, 1274-76 (2016) (observing that "vast majority of state courts" decide retroactivity by "case-specific analysis"). As the Supreme Court stated in Chicot, a rule of "absolute retroactiv[ity] . . . cannot be justified" without carefully considering the "consequences . . . [and]

circumstances" of each case. 308 U.S. at 374-75. In summarily dismissing pure prospectivity, the majority made no such careful consideration.

¶ 89. The majority goes on to address defendant's alternative arguments that the State's prosecution is barred by his 2002 plea agreement and the U.S. Constitution's Double Jeopardy Clause, and leaves whether the State failed to set forth a prima facie case of causation for the trial court to resolve on remand. Ante ¶¶ 1, 46-63. Because I would affirm the decision on appeal, I decline to address these issues. Affirming the decision on appeal requires only a conclusion that the year-and-a-day rule is abrogated purely prospectively and therefore bars the State's prosecution against defendant. No additional discussion of the issues regarding the plea agreement, double jeopardy, or causation is necessary. See Ferris v. Ferris, 140 Vt. 12, 16, 433 A.2d 304, 306 (1981) (recognizing that if "case is adequately disposed of on other grounds, we need not address [other] issue[s]" raised by the parties); see also Vt. Nat. Bank v. Dowrick, 144 Vt. 504, 515, 481 A.2d 396, 402 (1984) (Hill, J., dissenting) (declining to address other issues that would not be necessary to reach under dissent's proposed resolution to case); Orleans Vill. v. Union Mut. Fire Ins. Co., 133 Vt. 217, 224, 335 A.2d 315, 320 (1975) (Larrow, J., dissenting) (same). I therefore need go no further.

¶ 90. For the reasons articulated, I respectfully dissent. I am authorized to state that Justice Cohen joins this dissent.

_____
Associate Justice

45